STATE OF NORTH CAROLINA v. RICHARD WAYNE VASSEY

No. COA02-229

(Filed 3 December 2002)

**1. Homicide— second-degree murder—impaired driving—sufficiency of evidence**

The trial court did not err by failing to dismiss the charge of second-degree murder because there was substantial evidence that defendant's impaired driving caused the accident in which his girlfriend was killed including that: (1) defendant consumed at least ten to twelve beers over a course of six hours; (2) defendant stated he had been drinking beer heavily and possibly champagne as well; (3) defendant's employer who was in defendant's presence for at least twenty minutes the morning of the accident testified that defendant was still heavily drunk some six hours after defendant last reported consuming alcohol; (4) defendant's employer testified that defendant not only reeked of alcohol but that his eyes were glassy and his speech was slightly slurred; (5) the physical evidence from the crash site showed that, although road conditions were clear, defendant lost all control of the vehicle he was driving; and (6) defendant made a deliberate decision to drive despite the fact that he had no license and was impaired at the time, and defendant had been convicted of driving while impaired and with a revoked license on numerous occasions.

**2. Evidence— prior crimes or bad acts—impaired driving—malice—remoteness-harmless error**

The trial court did not err in a second-degree murder, driving while impaired and with a revoked license, and felonious hit and

run/failure to stop for personal injury case by admitting defendant's conviction in 1978 for impaired driving for the purpose of proving malice, because: (1) even if the conviction was erroneously admitted, such admission did not prejudice defendant when the State presented evidence of three later convictions for driving while impaired; (2) the State also demonstrated that defendant had been convicted four times of driving while license revoked; and (3) given the overwhelming evidence of defendant's faulty driving record, the exclusion of one additional conviction out of the seven that were before the jury could not have resulted in a different verdict.

Appeal by defendant from judgments entered 24 September 2001 by Judge Gentry Caudell in Gaston County Superior Court. Heard in the Court of Appeals 30 October 2002.

*Attorney General Roy Cooper, by Special Deputy Attorney General Isaac T. Avery, III, and Assistant Attorney General Patricia A. Duffy, for the State.*

*J. Clark Fischer for defendant appellant.*

TIMMONS-GOODSON, Judge.

Richard Wayne Vassey ("defendant") appeals from judgments of the trial court entered upon jury verdicts finding defendant guilty of second-degree murder, driving while impaired and with a revoked license, and felonious hit and run/failure to stop for personal injury. For the reasons stated herein, we uphold defendant's convictions.

At trial, the State presented evidence tending to show the following: In the early morning hours of 3 January 2001, passing motorists on Route 274 in Gaston County, North Carolina, discovered a vehicle in the ditch beside the road. As the motorists approached the vehicle, they noticed feet protruding from the driver's side window. Inside the vehicle was the body of Kathy Elaine Long ("Long"). Responding emergency assistance crews pronounced Long dead at the scene. A pathologist for the State testified that Long suffered lethal injuries to her skull and heart caused by blunt force trauma. The pathologist also noted that Long was legally intoxicated at the time of her death.

State Trooper Brian Owenby ("Trooper Owenby") testified for the State and described the scene of the accident. When Trooper Owenby arrived at the scene, he observed damage to the front left and the

back right quarter panels of the vehicle. Black tire impressions on the roadway revealed that the vehicle skidded sideways, crossing over the center divider line into the opposite lane and onto the shoulder of the road, where it collided with a mailbox and crashed into the ditch. Trooper Owenby confirmed that the road conditions were dry, with no snow or rain.

Mr. Trenton Wright ("Wright"), a former volunteer fireman, testified on behalf of the State. Wright stated that he and his family lived near Route 274, less than two miles away from the scene of the accident. In the early morning of 3 January 2001, Wright responded to someone at his front door. Looking outside, Wright observed defendant standing on the front porch. Defendant explained that his car had broken down at a restaurant located approximately four miles away, and that he was "freezing to death." Although the temperature was only twelve degrees Fahrenheit outside, defendant wore no shoes. Wright further described defendant's general physical appearance as "pretty rough," with "reddish" eyes, "messed-up" hair, and what appeared to be blood smeared across his forehead. Because he felt "uneasy" about defendant, Wright did not open the door and asked defendant to step away from the house. Wright did, however, offer to make a telephone call on defendant's behalf. Defendant instructed Wright to call Wendell Bunch ("Bunch"), the owner of a restaurant where defendant worked. After Wright reached Bunch at his home, he left the telephone on the porch for defendant's use. Defendant spoke on the telephone briefly, thanked Wright, and walked away.

Wendell Bunch testified that he had been acquainted with defendant, his employee, for approximately four years. Bunch stated that Long was defendant's girlfriend, that they lived together, and that she "always chauffeured [defendant] around" because defendant had no driver's license. Bunch reported that, when he spoke with defendant on Wright's telephone the morning of 3 January 2001, defendant told him that he was "all to hell in a bucket" and asked Bunch to pick him up. When Bunch asked defendant where Long was, defendant responded, "Just come and get me." According to Bunch, the "first thing [he] noticed" upon picking defendant up "was a strong presence of alcohol" emanating from defendant's person. Defendant's speech was slightly slurred, his eyes were glassy, and his hair was "messed up." Bunch noticed that defendant's blue jeans were ripped and there was blood on his right hand. In Bunch's opinion, defendant "wasn't knee-walking drunk, but he was definitely drunk." Shortly after Bunch picked defendant up, "he broke down and whimpered a little

bit and he said, 'I think something might have happened to [Long], I think she might be dead.' " Defendant denied knowing Long's location, however, explaining that he was worried because she had left home that morning at four a.m. and had not returned. Bunch drove defendant to his residence and left him there.

A few hours later, Bunch telephoned defendant, who informed him that Long had not yet returned home. Bunch was then contacted by State Trooper Charles Thomas ("Trooper Thomas"), who asked Bunch for defendant's telephone number. Bunch gave the officer defendant's number, but told Trooper Thomas nothing about his previous interaction with defendant that morning. Approximately fifteen minutes later, defendant called Bunch. Defendant told Bunch that he was very upset, because the police had informed him that Long had been killed in a wreck, and he was "worried that they were going to blame him for the accident." When defendant learned that Bunch had been contacted by Trooper Thomas, Bunch testified that defendant "came out and told me that he was involved in the wreck and to keep quiet about it and not say anything about me picking him up or anything." Bunch then "hit the ceiling," rebuking defendant for "dr[agging] [him] into something that [he] didn't want to be in the middle of." Before he hung up the telephone, Bunch told defendant to "either tell Trooper Thomas the truth or I will." After he and defendant spoke, Bunch telephoned Trooper Thomas and "basically told him the whole story."

Linda Anderson ("Anderson"), one of defendant's former co-workers at the restaurant, also testified for the State. Anderson spoke about the accident with defendant, who insisted that Long had been driving the car when the accident occurred. When Anderson told defendant that his story made no sense and demanded "to know the truth," defendant "started crying, he had been driving." According to Anderson, defendant said, "I was driving instead of [Long] and I had been drinking and I wrecked; and I pulled [Long] out from the passenger side to the driver's side out the driver's door." When Anderson asked defendant whether he attempted to obtain assistance for Long, defendant replied, "No, I panicked and I ran until my shoes fell off of my feet." Defendant told Anderson that he moved Long's body to the driver's side of the vehicle in order "to make it look like she was driving."

Another of defendant's co-workers, William Hovis ("Hovis"), testified similarly. Hovis spoke with defendant the morning of the accident. Although defendant initially told Hovis that Long had been

driving the vehicle, he later stated that "he was driving and the car went off the road and that—and that he got panicky and ran."

Trooper Thomas gave further evidence for the State. Although defendant initially denied having any knowledge of the accident, he eventually gave the following statement to Trooper Thomas:

We were drinking beer heavy [sic] last night. We ran out of champagne and we were going to the store. We rode up toward Rick's store, went to the stop sign at Cherryville. She turned right, went down that road for a little ways, and I told her she was going the wrong way. She turned around and went back toward Cherryville. The next thing I know, we was [sic] riding on grass and were in a ditch. I don't know. I hollered and said, "Be careful, we're going to hit that ditch." I looked over and she wasn't moving. I pulled her out of the car and tried to revive her by giving her mouth-to-mouth. I got scared and left. I panicked and flipped out. I'm being honest. I kept walking and walking. I went to a house and called my bossman [sic] and he came and got me in about 20 to 30 minutes.

After signing his statement, defendant told Trooper Thomas that "he was scared [Long's son] would kill him for what happened."

Unconvinced by defendant's statement, Trooper Thomas contacted Detective Jeff Costner ("Detective Costner") of the Gaston County Police Department. Detective Costner testified that he visited defendant at his residence on 8 January 2001, and that defendant agreed to accompany Detective Costner to the Cleveland County Sheriff's Department in order to answer questions. After being advised of his constitutional rights, defendant made the following statement:

Last week, Wednesday morning, 1-3-01, me and [Long] had been drinking. We were drinking beer and we ran out. We were at home, it was probably about 1:00 or 1:30 a.m. We were drinking Busch Lite and Bud Dry. We both decided to go out and get some more. I just put on my flip-flops, or they are actually sandals. We got in the car and [Long] drove. I don't know why she didn't even take her pocketbook or her glasses. We drove to several grocery stores that were closed . . . . We drove on Highway 216 and stopped at Rick's Country Store. [Long] couldn't see, so I got behind the wheel and drove . . . . I realized I was going the wrong way, so I turned around. I drove off the side of the road to the

STATE v. VASSEY

[154 N.C. App. 384 (2002)]

right first. I don't know why I ran off the road, I guess it was the alcohol. I drank, probably, 10 to 12 beers before this. When I ran off the road, it caused me to hit the bank on the other side of the road. I had been drinking since 7:00 p.m. and I stopped when me and [Long] ran out around . . . 1:00 or 1:30 a.m. I just remember looking over and seeing [Long's] head jerk forward and backwards. I heard her grunt. I'm not sure whether we had our seatbelts on, but we had the automatic seatbelts in the car. I left after I tried to revive her. I pulled [Long] from the passenger seat over to the driver's seat and tried to do CPR on her, but she was gone. I panicked and I ran. I seen [sic] the ambulances go by and I went to a couple of houses, but no one would let me . . . use the phone. I finally got this one guy to call my boss, Wendell Bunch. I feel so much better after I've told someone about this. I've been saved and quit drinking since this happened. I am sure [sic] sorry for what happened. I wish I could change it.

Finally, the State offered evidence tending to show that defendant's driver's license was permanently revoked and that defendant had been convicted of driving while impaired and driving with a revoked license on numerous previous occasions. Defendant offered no evidence. Upon conclusion of the evidence and after being instructed by the court, the jury found defendant guilty of second-degree murder, driving while impaired and with a revoked license, and felonious hit and run/failure to stop for personal injury. Defendant appeals.

---

Defendant contends that the trial court erred in denying his motion to dismiss the charge of second-degree murder, and in allowing evidence of defendant's prior conviction for driving while impaired. We address these issues in turn.

[1] By his first argument, defendant contends that the trial court erred in failing to dismiss the charge of second-degree murder. "In ruling upon a motion to dismiss, the trial court must examine the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences which may be drawn from the evidence." *State v. Hairston*, 137 N.C. App. 352, 354, 528 S.E.2d 29, 30 (2000). "When a defendant moves for dismissal, the trial court is to determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense." *State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991). Substantial evidence is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion. *See id.* If there is substantial evidence of each element of the charged offense and of the defendant being the perpetrator of the offense, the case is for the jury and the motion to dismiss should therefore be denied. *See State v. Locklear,* 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988).

Second-degree murder is the (1) unlawful killing (2) of a human being (3) with malice, but without premeditation and deliberation. *See State v. McDonald,* 151 N.C. App. 236, 565 S.E.2d 273, 277, *disc. review denied,* 356 N.C. 310, —— S.E.2d —— (2002). Thus, intent to kill is not a necessary element of second-degree murder, but " 'there must be an intentional act sufficient to show malice.' " *State v. Rich,* 351 N.C. 386, 395, 527 S.E.2d 299, 304 (2000) (quoting *State v. Brewer,* 328 N.C. 515, 522, 402 S.E.2d 380, 385 (1991)). Where the State seeks to prove malice connected with the act of driving a vehicle, "[t]he State need only show 'that defendant had the intent to perform the act of driving in such a reckless manner as reflects knowledge that injury or death would likely result, thus evidencing depravity of mind.' " *State v. Miller,* 142 N.C. App. 435, 441, 543 S.E.2d 201, 205 (2001) (quoting *Rich,* 351 N.C. at 395, 527 S.E.2d at 304).

In the instant case, defendant argues that the State presented insufficient evidence that defendant was appreciably impaired at the time of the accident, and that such impairment caused the accident leading to Long's death. Defendant correctly notes that, "[u]nder our statutes, the consumption of alcohol, standing alone, does not render a person impaired. An effect, however slight, on the defendant's faculties, is not enough to render him or her impaired. Nor does the fact that defendant smells of alcohol by itself control." *State v. Harrington,* 78 N.C. App. 39, 45, 336 S.E.2d 852, 855 (1985) (citations omitted). The *Harrington* Court went on to state, however, that "[o]n the other hand, the State need not show that the defendant is 'drunk,' i.e., that his or her faculties are *materially* impaired. The effect must be appreciable, that is, sufficient to be recognized and estimated, for a proper finding that defendant was impaired." *Id.* (citations omitted).

Viewed in the light most favorable to the State, there was substantial evidence that defendant's impaired driving caused the accident in which Long was killed. First, as to defendant's impairment, the State presented evidence tending to show that defendant consumed at least ten to twelve beers over the course of six hours. Defendant stated that he had been "drinking beer heavy [sic]," and

possibly champagne as well. Bunch testified that defendant was still "definitely drunk" at approximately seven o'clock on the morning of 3 January 2001, some six hours after defendant last reported consuming alcohol. It is well established that an opinion of a lay witness that the defendant was impaired is sufficient evidence of impairment, provided that the opinion is based on more than just the odor of alcohol. *See Rich*, 351 N.C. at 398-99, 527 S.E.2d at 305-06; *State v. Adkerson*, 90 N.C. App. 333, 338, 368 S.E.2d 434, 437 (1988). Bunch, who had known defendant for four years and was in defendant's presence for at least twenty minutes the morning of the accident, testified that defendant not only "reeked of alcohol," but that his eyes were glassy and his speech was slightly slurred. We conclude that the above-stated evidence sufficiently supported the jury's conclusion that defendant was impaired at the time of the accident in which Long was killed.

Secondly, the State provided substantial evidence that defendant's impaired driving caused the accident that killed Long. "The fact that a motorist has been drinking, when considered in connection with faulty driving such as following an irregular course on the highway or other conduct indicating an impairment of physical or mental faculties, is sufficient *prima facie* to show a violation of [the impaired driving statute]." *State v. Hewitt*, 263 N.C. 759, 764, 140 S.E.2d 241, 244 (1965). Defendant told several people, including Anderson, that "he had been drinking and . . . wrecked [the vehicle]." In his statement to Detective Costner, defendant asserted, "I don't know why I ran off the road, I guess it was the alcohol." Evidence from the accident site revealed that, although road conditions were clear, defendant lost all control of the vehicle he was driving. The vehicle skidded into the oncoming lane of traffic and onto the shoulder of the road, where it collided with a mailbox and crashed into the ditch. The evidence of defendant's impairment, together with the physical evidence from the crash site, provided ample evidence that defendant's impaired driving was the cause of the accident that killed Long.

Because there was substantial evidence that defendant was impaired at the time of the accident, and that his impaired driving caused the accident that resulted in Long's death, the trial court did not err in denying defendant's motion to dismiss the charge of second-degree murder. The evidence showed that defendant made a deliberate decision to drive, despite the fact that he had no license and was impaired at the time. The evidence further showed that

defendant had been convicted of driving while impaired and with a revoked license on numerous occasions. " '[A]ny reasonable person should know that an automobile operated by a legally intoxicated driver is reasonably likely to cause death to any and all persons who may find themselves in the automobile's path.' " *State v. Fuller*, 138 N.C. App. 481, 488, 531 S.E.2d 861, 867 (quoting *State v. McBride*, 118 N.C. App. 316, 319-20, 454 S.E.2d 840, 842 (1995)), *disc. review denied*, 353 N.C. 271, 546 S.E.2d 120 (2000); *see also State v. McAllister*, 138 N.C. App. 252, 260, 530 S.E.2d 859, 864-65 (holding that, where the defendant drove while impaired and with a revoked license, and where the defendant had been convicted of driving while impaired in the past, such evidence properly supported a finding of malice), *appeal dismissed*, 352 N.C. 681, 545 S.E.2d 724 (2000). Defendant's actions in the instant case clearly demonstrated the malice necessary for conviction of second-degree murder, and we therefore overrule defendant's first exception to the record.

[2] Defendant next argues that the trial court committed prejudicial error by admitting his 1978 conviction for driving while impaired into evidence for the purpose of proving malice. Defendant contends that this conviction was too remote in time to be relevant and irreparably prejudiced his case before the jury. We conclude that, even if the 1978 conviction was erroneously admitted, such admission did not prejudice defendant. In addition to the 1978 conviction, the State presented evidence of three later convictions for driving while impaired. The State also demonstrated that defendant had been convicted four times for driving with a revoked license. Given the overwhelming evidence of defendant's faulty driving record, we hold that the exclusion of one additional conviction out of the seven that were before the jury could not have resulted in a different verdict. We therefore overrule this assignment of error.

In conclusion, we hold that the trial court did not err in failing to dismiss the charge of second-degree murder. We further hold that the admission of defendant's conviction in 1978 of impaired driving did not prejudice defendant.

No error.

Judges WYNN and HUNTER concur.