**William Thomas BAUBERGER,**
**Petitioner,**

v.

**Grady J. HAYNES, Supt. of Warren**
**Correctional Inst., Respondent.**

**No. 1:08cv15.**

United States District Court,
M.D. North Carolina.

Oct. 27, 2009.

Kearns Davis, Brooks Pierce McLendon Humphrey & Leonard, Greensboro, NC, David Lybrook Neal, David L. Neal, Attorney at Law, Hillsboro, NC, for Petitioner.

Clarence Joe Delforge, III, N.C. Department of Justice, Raleigh, NC, for Respondent.

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

On May 15, 2008, in accordance with 28 U.S.C. § 636(b), the United States Magistrate Judge filed a Memorandum Opinion and Recommendation ("Recommendation"). (Doc. 12.) Respondent (the "State") timely raised several objections to the Recommendation (Doc. 14), and Petitioner William Thomas Bauberger ("Bauberger") responded (Doc. 17). The court entertained oral argument on the objections on September 17, 2009. For the reasons set forth herein, the objections are overruled and the Recommendation is adopted.

## I. BACKGROUND

The facts are not in dispute and are set out in more detail in the Magistrate Judge's report. Those facts necessary to resolve the State's objections are set forth below.

On February 3, 2002, Petitioner Bauberger consumed in excess of ten beers over the course of approximately five hours at a Super Bowl party and then left via his car to visit a friend. En route, he drove the wrong way down an exit ramp of U.S. Highway 421 in Winston–Salem, North Carolina, and collided with a car driven by William Foy. Tragically, Foy's wife, a passenger, died within minutes of the crash.[1]

---

1. Foy, who suffered a broken leg and hand in the accident in addition to the loss of his wife, appeared at the hearing on the State's objections pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771(b)(2), and eloquently expressed the impact Bauberger's actions had on him and his family.

Bauberger was charged with second-degree murder, the lesser included offense of involuntary manslaughter, and assault with a deadly weapon inflicting serious injury. At trial after the close of the evidence, Bauberger conceded guilt as to the involuntary manslaughter charge only. A principal issue for the jury, therefore, was whether the state proved Bauberger acted with malice for a second-degree murder conviction. To prove malice, the state presented evidence that Bauberger (1) admitted to driving with a blood alcohol level of .20 on the night of the crash; (2) had at least two prior convictions for Driving While Intoxicated, as well as other driving offenses such as reckless driving; (3) disregarded road signs and other warnings on the night of the crash; (4) disregarded prior court orders not to drive; (5) drove that night despite having had his license revoked; and (6) acted in a profane manner to emergency personnel and others at the scene of the crash.

After the presentation of evidence, the jury was instructed and began its deliberations at 11:48 a.m. on August 14, 2003. Shortly thereafter, the jury sent a note to the trial judge requesting a written copy of the instruction as to the elements of second-degree murder and manslaughter. The jury was brought into the courtroom at 12:11 p.m., and the court read the jury's question aloud. The trial judge noted that he did not have a written instruction in a form that could be readily submitted to the jury and re-read his charge for second-degree murder (including malice) and involuntary manslaughter. (Tr. Vol. IV at 35–43.) One of the jurors asked that they be permitted to continue to deliberate before the lunch break, and the jurors were returned to the jury room.

Shortly thereafter, the jury sent another note requesting "a copy of the fifth element of second-degree murder"—malice, as well as a copy of any other elements to which the defendant did not stipulate. The jury's note advised, "Many of us are visual people." (Tr. Vol. IV at 44.) The trial judge returned the jury to the courtroom at 12:46 p.m. and advised them that he would have a clean copy of the elements prepared over the lunch recess for their use. Then a colloquy arose between several jurors and the trial judge. One of the juror's indicated, "[b]asically, all we're looking for is that sheet," referring to the judge's instructions. Another juror corrected, "Well, that's not true." The previous juror said, "we would like to at least have that while you work on the other copy." And another added, "We wanted the second degree and manslaughter." (Doc. 3, Ex. 3, Tr. Vol. IV at 46.) The trial judge promised the jury copies after lunch and dismissed them at 12:47 p.m.

During the lunch recess, the jury foreman went to the Forsyth County Public Library and checked out Webster's New Collegiate Dictionary. He brought the dictionary into the jury room after lunch and, during deliberations that resumed at 2 p.m., shared with the jurors the definition of several of the words contained in the judge's instructions for "malice." Sometime at or after 2 p.m., one of the lawyers handed the judge a typed version of some portion of the instructions. Unfortunately the transcript does not reflect the contents of the document or when this occurred. This typed version was simply given to the jury after it had resumed its deliberations, per agreement of counsel. The bailiff also asked for a highlighter, presumably at the jury's request.

The jury deliberated for two hours after lunch and was returned to the courtroom at 4:08 p.m. when it advised that it had reached a verdict on one charge but was deadlocked 7 to 5 on the other charge. The court emphasized the jurors' duty to do whatever they could to reach a verdict,

to "reason this matter over together as reasonable men and women and to reconcile your differences if you can without the surrender of conscientious convictions" as to the weight of the evidence, and returned the jury to deliberate further at 4:10 p.m. (Tr. Vol. IV at 51–52.)

At 5:03 p.m., the foreman advised the court that the jury had moved to 10 to 2 on the remaining count. The foreman advised that in lieu of quitting for the day they would "keep on for a little while." (Tr. Vol. IV at 56.)

At 6:06 p.m., the jury returned a verdict finding Bauberger guilty of second-degree murder and assault with a deadly weapon inflicting serious injury.

Following the verdict, the court was informed that the jury may have consulted a dictionary during deliberations. Bauberger sought relief in a state court motion for appropriate relief three days after his sentencing. Having been unsuccessful in his appeals, he sought relief in federal court in this petition.

The Magistrate Judge issued a 39–page Report and recommends that the petition be granted. The State has filed multiple objections to the Report and Recommendation. This court reviews the objections *de novo.* 28 U.S.C. § 636(b)(1)(C). All of the objections have been carefully considered, and two that warrant discussion are addressed below.

## II. ANALYSIS

### A. Standard of Review

■ The State's first objection relates to the standard of review under 28 U.S.C. § 2254(d). Section 2254(d)(1) provides that an application for a writ of habeas corpus shall not be granted unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court "unreasonably applies" U.S. Supreme Court law when it "identifies the correct governing legal principle ... but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "[T]he state court's decision must have been more than incorrect or erroneous[,] ... [it] must have been 'objectively unreasonable.'" *Wiggins v. Smith,* 539 U.S. 510, 520–521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (internal citation omitted). The State objects to the Magistrate Judge's determination that the decision of the North Carolina Court of Appeals—finding that the dictionary was not an extrinsic influence on the jury's deliberations—was an unreasonable application of clearly established law. (Doc. 14 at 4–9.)

■ The U.S. Supreme Court has clearly established that an extrinsic influence on a jury's deliberations violates a defendant's Sixth and Fourteenth Amendment rights to an impartial jury, to confront witnesses against him, and to be present at all critical stages of his trial. *See, e.g., Rogers v. United States,* 422 U.S. 35, 38–40, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *Parker v. Gladden,* 385 U.S. 363, 364–66, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); *Turner v. Louisiana,* 379 U.S. 466, 473, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). Furthermore, "[u]nder clearly established Supreme Court case law, an influence is ... [extrinsic] if it (1) is extraneous prejudicial information; i.e., information that was not admitted into evidence but nevertheless bears on a fact at issue in the case, *see Parker,* 385 U.S. at 364, 87 S.Ct. 468; *Turner,* 379 U.S. at 473, 85 S.Ct. 546, or (2) is an outside influence upon the partiality of the jury, such as 'private communica-

tion, contact, or tampering ... with a juror.'" *Robinson v. Polk*, 438 F.3d 350, 363 (4th Cir.2006) (citing *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954)).

Though the State correctly observes that the Supreme Court has not specifically held that a jury's use of a dictionary is an extrinsic influence (Doc. 14 at 8), "the relevant Supreme Court precedent need not be directly on point, but must provide a 'governing legal principle' and articulate specific considerations for the lower courts to follow when applying the precedent." *Quinn v. Haynes*, 234 F.3d 837, 844 (4th Cir.2000) (citing *Williams*, 529 U.S. at 413, 120 S.Ct. 1495); *see Panetti v. Quarterman*, 551 U.S. 930, 953, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) ("That the standard is stated in general terms does not mean the application was reasonable. [Section 2254(d)(1) ] does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'"); *Lockyer v. Andrade*, 538 U.S. 63, 76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) ("Section 2254(d)(1) permits a federal court to grant habeas relief based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced."); *see also Williams*, 529 U.S. at 382, 120 S.Ct. 1495 (Stevens, J., concurring) ("[R]ules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule.").

In this case, the North Carolina Court of Appeals generally identified the issue as being whether evidence of the jurors' resort to a dictionary was an impermissible extrinsic influence that violated Bauberger's Sixth Amendment rights. *State v. Bauberger*, 176 N.C.App. 465, 468–73, 626 S.E.2d 700, 703–05 (2006). Even though the Court of Appeals failed to rely specifically on U.S. Supreme Court case law, section 2254(d)(1) requires neither citation to nor awareness of such precedent. *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002); *Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir.2000) (en banc). Acknowledging juror misconduct, the Court of Appeals concluded that evidence of the jury's resort to a dictionary was not extrinsic and did not violate the Sixth Amendment because such evidence "did not discredit defendant's testimony or witnesses; it concerned legal terminology." *Bauberger*, 176 N.C.App. at 473, 626 S.E.2d at 706. But resort to a dictionary is an extrinsic influence because it contains definitions of legal terms that were not presented during the trial, imparted by the trial judge in the jury instructions, or based upon the common knowledge, belief, or impression of the jurors.[2] *E.g., Fields v. Brown*, 503 F.3d 755, 778–79 (9th Cir. 2007); *United States v. Vig*, 167 F.3d 443, 450 (8th Cir.1999). The North Carolina Court of Appeals' determination was therefore an objectively unreasonable ap-

---

**2.** The unreasonableness of a state court's application of U.S. Supreme Court precedent cannot be established by decisions of lower federal courts or state courts. *Williams*, 529 U.S. at 410, 120 S.Ct. 1495. Nevertheless, the analysis of these decisions is persuasive in the objective inquiry before the court. *E.g., O'Laughlin v. O'Brien*, 568 F.3d 287, 305 (1st Cir.2009); *Lewis v. Mayle*, 391 F.3d 989, 995 (9th Cir.2004); *Copeland v. Washington*, 232 F.3d 969, 974 (8th Cir.2000). Under Fourth Circuit case law, a juror's consultation of a dictionary constitutes an extraneous influence. *United States v. Duncan*, 598 F.2d 839, 866 (4th Cir.1979); *see McNeill v. Polk*, 476 F.3d 206, 226 (4th Cir.2007) (King, J., concurring). Furthermore, as the dissenting judge in *Bauberger* noted, this view is held almost universally. *Bauberger*, 176 N.C.App. at 477–79, 626 S.E.2d at 708–10 (Geer, J., dissenting) (citing state and federal cases).

plication of the U.S. Supreme Court's clearly established test requiring that the issue of prejudice be examined, and the State's objection is overruled.

### B. Prejudice

The more difficult question, which the court advised the parties to address during the September 17, 2009, hearing, is whether the jury's resort to the dictionary resulted in legally cognizable prejudice to Bauberger. The State argues that, even if the dictionary was an extrinsic influence on the jury's deliberations, it was not so prejudicial as to impair Bauberger's Sixth and Fourteenth Amendment rights. (Doc. 14 at 10–17.) Specifically, the State contends that the definitions provided by the dictionary did not fundamentally alter the standard for "malice" when the jury's instruction is considered as a whole. The North Carolina Court of Appeals failed to consider this issue insofar as it concluded that the dictionary was not an extrinsic influence. *Bauberger*, 176 N.C.App. at 472, 626 S.E.2d at 705. In any event, the State is not entitled to have prejudice considered based upon the deferential standard under the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d). *Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007).

■ The parties agree that Bauberger is entitled to relief if the trial court's constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). A federal habeas court must grant relief if it is in "grave doubt" as to the harmlessness of the error. *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir.2002). " '[G]rave doubt' exists when, in the relevant circumstances, the question is so evenly balanced that the reviewing court finds itself in 'virtual equipose' [sic] on the harmlessness issue." *Barbe v. McBride*, 521 F.3d 443, 461 (4th Cir.2008); *Fullwood*, 290 F.3d at 679; *accord O'Neal*, 513 U.S. at 435, 115 S.Ct. 992. The test is whether it can be said with fair assurance that not a single juror's decision was swayed by resort to the extrinsic influence of the dictionary. *See Parker*, 385 U.S. at 366, 87 S.Ct. 468 (holding that a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors"); *Lawson v. Borg*, 60 F.3d 608, 613 (9th Cir.1995) ("[E]ven a single juror's improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict.").

In *O'Neal*, the Supreme Court addressed the burden of proof for harmlessness under *Brecht*. 513 U.S. at 436–37, 115 S.Ct. 992. Rather than considering the question in terms of proof burdens, the Court stated, the appropriate question to ask is: "Do I, the judge, think that the error substantially influenced the jury's decision?" [3] *Id*. at 436–37, 115 S.Ct. 992. If the record is so evenly balanced that "[i]t is extremely difficult to say," the judge is in grave doubt as to the harmless-

---

**3.** The issue of burden of proof has been presented inconsistently by the parties. In its objections to the Recommendation, the State argued that Bauberger bears the burden of proving prejudice (Doc. 14 at 11), relying on Judge King's concurring opinion in *McNeill*, 476 F.3d at 226–29. Bauberger contended in earlier filings that the State bore the burden of rebutting a presumption of prejudice.

(Doc. 11 at 15–16.) At the hearing on the State's objections on September 17, 2009, counsel for the State offered that it ultimately bore the burden regarding the *Brecht* standard, and Bauberger's counsel argued that in light of *O'Neal* the court should look to the record to determine whether grave doubt exists regarding the use of the dictionary and not focus upon the burden issue.

ness and "the petitioner must win." *Id.* at 437, 442, 115 S.Ct. 992.

"[A] juror's use of a dictionary is not an event that is inherently prejudicial." *McNeill,* 476 F.3d at 226 (King, J., concurring). The Magistrate Judge applied, and the parties did not object to, the following five-part test to assess the prejudicial impact of a juror's use of a dictionary during deliberations:

> (1) The importance of the word or phrase being defined to the resolution of the case. (2) The extent to which the dictionary definition differs from the jury instructions or from the proper legal definition. (3) The extent to which the jury discussed and emphasized the definition. (4) The strength of the evidence and whether the jury had difficulty reaching a verdict prior to introduction of the dictionary definition. (5) Any other factors that relate to a determination of prejudice.

*Id.* (King, J., concurring) (quoting *Mayhue v. St. Francis Hosp. of Wichita, Inc.,* 969 F.2d 919, 924 (10th Cir.1992)). Each factor is addressed in turn below.

### 1. Importance of the Words

There is no doubt that the defined words were significant to the resolution of the case. The Magistrate Judge noted that "the central issue between convicting Petitioner in this case of second-degree murder (to which he pled not guilty) or involuntary manslaughter (to which he conceded guilt) was whether he acted with 'malice.' " (Doc. 12 at 34.) The trial judge instructed the jury on "malice" as follows:

Malice is a necessary element which distinguishes second degree murder from manslaughter. Malice arises when an act which is inherently dangerous to human life is intentionally done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief.

(Doc. 3, Ex. 3, Tr. Vol. IV at 38.) Although malice is the distinguishing element between second-degree murder and manslaughter, *State v. Cole,* 280 N.C. 398, 402–03, 185 S.E.2d 833, 836 (1972); *State v. Hall,* 59 N.C.App. 567, 573, 297 S.E.2d 614, 617 (1982), the jurors never looked up the definition of "malice" during their deliberations.[4] Instead, they consulted the dictionary for the following words within the court's charge on malice: "recklessly;" "wantonly;" "manifest;" "utterly;" and "regard." Bauberger emphasizes the importance of the words "recklessly" and "wantonly" to the definition of malice (Doc. 3 at 15–17), implicitly conceding that the definitions of "manifest," "utterly," and "regard" lacked legal significance for purposes of his petition.

### 2. Difference in Legal and Dictionary Definitions

■ The next inquiry is the extent to which the dictionary definitions differed from the proper legal definition as to malice. A jury instruction "will be construed contextually, and isolated portions will not be held prejudicial when the charge as [a] whole is correct." *State v. Rich,* 351 N.C. 386, 394, 527 S.E.2d 299, 303 (2000).

The dictionary defined "recklessly" as "lack of due caution." (Doc. 7, Ex. 4 at 2.) "Wantonly" was defined as an "arrogant

---

4. A juror admitted that he looked up the definition of "malice" in his home copy of Webster's dictionary before the judge charged the jury. (Doc. 7, Ex. 4 at 4.) He testified that he could not remember the dictionary definition, did not copy it down, and did not share it with any other juror. (Doc. 7, Ex. 4 at 4.) Bauberger does not put significant emphasis on this event, focusing rather on the activities during the jury's deliberations. Based on the court's resolution of Bauberger's petition, this juror misconduct does not affect the outcome.

recklessness of justice or the feelings of others." (Doc. 7, Ex. 4 at 2.) Bauberger argues that these definitions effectively lowered the prosecution's burden of proof for "malice" to a standard closer to negligence. (Doc. 3 at 15–16; Doc. 11 at 17–18.) He also argues that because we do not know, nor are we permitted to determine, how the jury considered these definitions, we cannot say that the jury applied the correct legal standard. The State claims that the difference between the dictionary definitions and the jury instruction, when considered as a whole, was only "marginal at best" and, if anything, more favorable to Bauberger. (Doc. 7 at 13; Doc. 14 at 11–13.)

Because the defined terms were part of the definition of "malice," the court concludes that the jurors could not have reasonably substituted them for the definition of "malice" *in toto*. Thus, the question is whether the jurors' consideration of the dictionary terms in the context of the jury instructions prejudiced the verdict under the *Brecht* standard.

The trial judge's charge to the jury on malice, as noted above, provided that "[m]alice arises when an act which is inherently dangerous to human life is intentionally done so *recklessly* and *wantonly* as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief." (Doc. 3, Ex. 3, Tr. Vol. IV at 22–23)(emphasis added.) The trial judge had contrasted this standard with that for involuntary manslaughter, with which Bauberger was also charged, which the court charged requires "culpable negligence." (Doc. 3, Ex. 3, Tr. Vol. IV at 24.) "Culpable negligence," the court explained, requires either (1) a "willful, wanton, or intentional" violation of law governing the operation of a motor vehicle, or (2) an "inadvertent or unintentional violation of the law" that is "accompanied by recklessness of probable consequences of a dangerous nature when tested by the rule of reasonable foresight amounting altogether to a thoughtless disregard of consequences or a heedless indifference to the safety of others." (*Id.*) The trial judge also instructed on the meaning of "reckless" in the context of reckless driving, which the court directed required that the jury find Bauberger "acted carelessly and heedlessly in willful or wanton disregard of the rights or safety of others." (Tr. Vol. VI at 21–22).

The parties have not identified any case specifically defining "reckless" within the context of the requirement of criminal malice under North Carolina law.[5] As the Magistrate Judge noted, however, the North Carolina courts have clearly stated that malice for murder requires a "high degree of recklessness." (Doc. 12 at 36–37.) By reference even to the trial court's instructions for reckless driving and culpable negligence, the dictionary definition of "reckless"—"lack of due caution"—sets a lesser standard. *See Rich*, 351 N.C. at 395, 527 S.E.2d at 303. It is hard to understand, consequently, the State's argument that Bauberger somehow benefitted from this definition.

Unlike the term "recklessly," North Carolina courts have defined "wantonly"

---

5. North Carolina courts have defined the term "reckless" in the civil context "to be merely a synonym for "wanton," " which, in turn, is defined as "an act manifesting a reckless disregard for the rights and safety of others." *Pleasant v. Johnson*, 312 N.C. 710, 714, 325 S.E.2d 244, 248 (1985) (finding that for an employee to overcome the Worker's Compensation bar in suing a co-employee, he or she must show "willful, wanton and reckless" conduct, rather than simple negligence). Thus, even though recklessness may equate to wantonness, recklessness carries a heightened standard beyond "lack of due caution" in the civil context in North Carolina. It is difficult to imagine that the criminal standard would be any less demanding.

with respect to criminal statutes. *State v. Williams,* 284 N.C. 67, 72–73, 199 S.E.2d 409, 412 (1973); *State v. Davis,* 86 N.C.App. 25, 30, 356 S.E.2d 607, 610 (1987). "Wantonness ... connotes intentional wrongdoing.... Conduct is wanton when in conscious and intentional disregard of and indifference to the rights and safety of others." *Williams,* 284 N.C. at 72–73, 199 S.E.2d at 412 (internal quotation marks and citation omitted). Furthermore, "[t]he words 'willful' and 'wanton' have substantially the same meaning when used in reference to the requisite state of mind for a violation of a criminal statute." *Davis,* 86 N.C.App. at 30, 356 S.E.2d at 610. " 'Willful' as used in criminal statutes means the wrongful doing of an act without justification or excuse, or the commission of an act purposely and deliberately in violation of the law." *Id.* at 30, 356 S.E.2d at 610. These definitions set a standard that is higher than Webster's definition for "wanton" as "arrogant recklessness of justice or the feelings of others."

The State argues that, even if the dictionary definitions for "reckless" and "wanton" alone set a marginally lower bar, they could not have resulted in a materially lower standard when the remainder of the instruction is considered, as it must. Indeed, the instruction requires "an act which is inherently dangerous to human life" that is *"intentionally done* so recklessly and wantonly *as to manifest a mind* utterly without regard for human life and social duty *and deliberately bent on mischief."* (Emphasis added.) The State argues that a standard of "lack of due caution" as to the "reckless and wanton" portion of the charge did not materially lower the overall standard for malice when the jury was required to find an "intentional" act "manifest[ing] a mind utterly without regard for human life and social duty and deliberately bent on mischief." The State's argument has some surface appeal. However, the question is not whether many or even most jurors would have employed the State's interpretation. Rather, it is whether at least one juror objectively could have considered the dictionary terms to permit a finding of malice based on a standard of carelessness, which is less than the wantonness and recklessness standard to which the State is to be held. The court finds that the difference in the dictionary and legal definitions is meaningful and that there is grave doubt that at least one juror reasonably could have read the instruction to adopt an impermissible lower standard.[6]

### 3. Emphasis and discussion of definitions by jurors

The next factor is the extent to which the jury discussed and emphasized the dictionary definitions. "[A]lthough a juror can testify that she consulted an extraneous influence and related her findings to the panel, neither she nor any other juror can testify about *any* effect the extraneous influence may have had on the verdict or on the jury deliberations." *McNeill,* 476 F.3d at 226 (King, J., concurring) (emphasis added); *see* Fed.R.Evid. 606(b); *Fullwood,* 290 F.3d at 679–80.[7] Based on the affidavits of jurors, the foreperson shared the dictionary definitions with all other jurors after the lunch break. Any other testimony regarding any claimed emphasis given to the definitions or evidence of the

---

6. At best, inserting "lack of due caution" for the requisite recklessness standard appears to create a confusing instruction in that malice would then require an intentional act committed negligently.

7. North Carolina's evidentiary rules also impose the same limitations upon juror testimony of this type. *See* N.C. Gen.Stat. § 8C–1, Rule 606(b); *accord Robinson,* 438 F.3d at 359 n. 10 (noting the state rule "is identical to its federal counterpart").

actual impact upon jury deliberations is foreclosed by Federal Rule of Evidence 606(b).[8]

What is known is that the jury foreman sought out a dictionary after specifically advising the trial judge of the jury's interest in a definition for "malice," brought it into the jury room after lunch, and shared particular definitions with the other jurors. (Doc. 7, Ex. 4 at 2); *Bauberger,* 176 N.C.App. at 468–69, 626 S.E.2d at 703. It also bears importance that it was the foreman who carried out these activities, allowing a reasonable inference that the other jurors may have given the definitions more weight. *See Mayhue,* 969 F.2d at 925. Notwithstanding the limited inquiry permissible under this factor, the record demonstrates that several jurors expressed a need for the instruction (especially in a written form, such as was the dictionary) and that the definitions were shared by all twelve of them.

**8.** Upon review of other courts' application of the third factor of the *Mayhue* test and of Federal Rule of Evidence 606(b), the relevant considerations for this factor seem to be how many jurors were exposed to the potentially prejudicial information and in what manner. *E.g., United States v. Aguirre,* 108 F.3d 1284, 1289 (10th Cir.1997) (pointing primarily to a juror reading aloud the dictionary definition to the other jurors); *Mayhue,* 969 F.2d at 925 (noting that the foreperson obtained and read the definitions to the others); *Lintz v. Am. Gen. Fin., Inc.,* 76 F.Supp.2d 1200 (D.Kan. 1999) (discussing how two jurors consulted a dictionary regarding "malice" and "reckless," as well as how the foreperson told the two jurors they could not share the information with anyone else).

**9.** The court's inquiry into the strength of the evidence should not be misconstrued as a sufficiency of the evidence inquiry, which is inappropriate under the *Brecht* standard. *See O'Neal,* 513 U.S. at 438, 115 S.Ct. 992 (quoting *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), which is the basis for the *Brecht* standard, that the "inquiry cannot be merely whether there was enough to support the result").

## 4. Strength of the Evidence and Difficulty Reaching a Verdict

The next consideration is the strength of the evidence [9] and whether the jury had difficulty reaching a verdict prior to the introduction of the dictionary definition.

The record contains extensive evidence to support a finding of malice and the other elements of second-degree murder. On the night of the incident, Bauberger was driving while impaired, with a revoked license, at high speed, and the wrong way on a freeway exit ramp. He was on notice as to the serious consequences of his actions because he had been convicted on at least two previous occasions of driving while impaired, including one conviction one month before the incident. He also had been convicted of reckless driving and other traffic-related offenses.[10]

The court simply looks at the strength of evidence as a function of the total record to aid in its evaluation of how likely the jurors would give weight to the dictionary definitions.

**10.** Courts have previously held that such conduct may support a conviction of second-degree murder. *E.g., State v. Westbrook,* 175 N.C.App. 128, 135, 623 S.E.2d 73, 78 (2005) (upholding conviction of second-degree murder when defendant had been convicted of driving while impaired nine years earlier and was driving while impaired, speeding, crossing the center lane, traveling in a lane in the opposite direction, and running a red light); *State v. Vassey,* 154 N.C.App. 384, 391–92, 572 S.E.2d 248, 253 (2002) (upholding conviction of second-degree murder when defendant drove while impaired, with a revoked license, and with numerous prior convictions of those offenses); *State v. Miller,* 142 N.C.App. 435, 439–42, 543 S.E.2d 201, 204–06 (2001) (upholding conviction of second-degree murder when defendant was driving while impaired, was swerving prior to the accident, and had been convicted of driving while impaired, driving under the influence,

Despite this strong evidence, there is evidence the jury had difficulty discerning the meaning of "malice" prior to the introduction of the dictionary definitions. Shortly after the jury began its deliberations, it requested a copy of the law on second-degree murder and manslaughter. (Tr. Vol. IV at 35–43.) Within thirty minutes of that request, the jurors asked for a copy of the instruction for malice. (*Id.* at 44.) Although the jury knew that the judge agreed to provide a copy of the elements of second-degree murder after lunch, the foreperson took the unusual step of trekking to the local public library over the jury's lunch break to check out the dictionary (Doc. 7, Ex. 4 at 2). *Bauberger,* 176 N.C.App. at 468–69, 626 S.E.2d at 703. The foreperson subsequently shared the dictionary definitions with other jurors. The transcript also reflects an unusual colloquy between the judge and several jurors, giving rise to a reasonable inference that the concern as to the meaning of "malice" was not isolated. (Doc. 7, Ex. 4 at 2; Doc. 3, Ex. 3., Tr. Vol. IV at 46); *Bauberger,* 176 N.C.App. at 469, 626 S.E.2d at 703.

On the other hand, despite quickly seeking out the dictionary, none of the evidence demonstrates that the jury was at an impasse or deadlocked prior to obtaining the dictionary. *Compare Mayhue,* 969 F.2d at 926 (finding that "[t]he day before the definitions were read and the verdict was reached, the jury twice reported to the court that it was deadlocked."), *with Marino v. Vasquez,* 812 F.2d 499, 505 (9th Cir.1987) (noting that the juror "had held out against a verdict of guilty of murder for nearly thirty days"). In fact, the jury asked for the instruction in part because some were, in the words of one juror,

"visual people." The jury also reported an inability to reach a decision regarding one of the two counts on two occasions after learning the dictionary definitions at issue. (Tr. Vol. IV at 51, 54–55.)

Thus, the strength of the evidence weighs in favor of the State, but the jury's expressed concern over discerning the meaning of "malice" and apparent need for additional time to reach a verdict on one of the counts weighs in favor of Bauberger.

### 5. Other Relevant Factors

Finally, the amount of time that elapsed between the introduction of the dictionary definition and the verdict should be considered. *Mayhue,* 969 F.2d at 926 (finding that a juror's use of a dictionary definition prejudiced the defendant when the jury "reach[ed] a verdict less than three hours after the foreperson read the definitions"); *Marino,* 812 F.2d at 505 (finding that a juror's use of a dictionary definition prejudiced the defendant when the juror "changed his vote to guilty shortly after receiving the definition").

In this case, the jury continued to deliberate after the foreperson read the dictionary definitions. It did not return a verdict instantaneously or even soon after the introduction of the dictionary definitions. The jury instead deliberated for two hours before informing the court that it was deadlocked on one of the counts. (Doc. 3, Ex. 3, Tr. Vol. IV at 51.) Even after the court charged the jurors to deliberate further, another two hours passed before the jury returned a guilty verdict. (*Id.* at 57–58.) That the jury's deliberation for approximately four hours after hearing the dictionary definitions was substantially longer than the period it had deliberated before receiving the definitions is of limit-

and careless and reckless driving); *see also United States v. Fleming,* 739 F.2d 945, 947–48 (4th Cir.1984) (upholding conviction of second-degree murder under federal law for defendant who was driving drunk, at an excessive speed, on the wrong side of the highway, and with prior convictions of driving while intoxicated).

ed significance, because the dictionary was consulted so early in the deliberative process. Assuming that the murder charge was the charge upon which the jury was deadlocked (a fact not revealed in the transcript), it appears that the jury moved from 7/5 to 10/2 within three hours of consulting the dictionary and reached its verdict within another hour. All told, a verdict was reached within four hours of the misconduct. This factor therefore tips in favor of Bauberger.

Based on all these factors, the court concludes that it is extremely difficult to say whether the jury's resort to a dictionary as to the definitions of the component terms of the instruction at the heart of the charge—malice—had a substantial and injurious effect or influence in determining the jury's verdict. Improper prejudice regarding a single juror is sufficient grounds to grant a habeas petition. Here, all twelve jurors were exposed to the extraneous information. Evidentiary rules prevent the court from delving into the actual effect of the definitions on any juror, but such broad exposure creates a high likelihood that one juror may have been influenced by the dictionary definitions such that the standard in the judge's malice instruction was lessened. The court finds that the facts in the record are at least evenly balanced so as to cause grave doubt as to the harmlessness of the jurors' misconduct. As such, the court agrees with the Recommendation to grant Bauberger's petition for writ of habeas corpus.

When juries resort to self-help in assessing the law—even when well-intentioned, they jeopardize the deliberative process and a defendant's fundamental rights under the Constitution to an impartial jury. The purpose of these rights is to "protect[ ] individuals from unconstitutional convictions and help to guarantee the integrity of the criminal process by assuring that trials are fundamentally fair."

*O'Neal,* 513 U.S. at 442, 115 S.Ct. 992. As reprehensible as is Bauberger's conduct, he is entitled to the protections of the Sixth Amendment and thus a new trial as to the second-degree murder charge.

### III. CONCLUSION

The court has reviewed the portions of the Report and Recommendation to which objections were made and has made a *de novo* determination, which is in accord therewith, as supplemented by this Memorandum Opinion. The Magistrate Judge's Recommendation is hereby adopted.

IT IS THEREFORE ORDERED that the State's motion for summary judgment (Doc. 6) be DENIED and the petition (Doc. 1) be GRANTED.

IT IS FURTHER ORDERED that the writ of habeas corpus issue, and that Bauberger's conviction for second-degree murder in the case of *State v. Bauberger,* 02 CRS 51225, be vacated and set aside and the State of North Carolina unconditionally release Bauberger from custody unless, within a reasonable time of the date of entry of the Judgment in this case, Bauberger is retried on the second-degree murder charge.

IT IS FURTHER ORDERED that the parties inform the court whether there has been compliance with this Order.

A Judgment will be entered contemporaneously with this Order.

### MEMORANDUM OPINION AND RECOMMENDATION

WALLACE W. DIXON, United States Magistrate Judge.

This matter is before the court on Respondent's motion for summary judgment (docket no. 6). Petitioner has responded in opposition to the motion and the matter is ripe for disposition. Because the parties

have not consented to the jurisdiction of the magistrate judge, the court must deal with the motion by way of recommendation. For the following reasons, it will be recommended that Respondent's motion for summary judgment be denied and that the petition be granted.

## I. Background

On June 24, 2002, Petitioner, a state court prisoner, was indicted by a grand jury in Forsyth County for second-degree murder and assault with a deadly weapon inflicting serious injury. On August 14, 2003, a jury found Petitioner guilty of both charges. On August 15, 2003, the trial court sentenced Petitioner to 189–236 months for second-degree murder, and to a suspended sentence of 29–44 months for assault with a deadly weapon inflicting serious injury, with the sentences to run consecutively.

On August 18, 2003, Petitioner filed a motion for appropriate relief ("MAR") in the state court, alleging jury misconduct based on the jury's consultation of a dictionary during deliberations. On December 17, 2003, a hearing was held on the MAR. On February 4, 2004, the MAR was denied by written order. On February 6, 2004, Petitioner filed a written notice of appeal with the North Carolina Court of Appeals. Petitioner appealed from his conviction and sentence at trial and from the denial of his MAR.

On March 7, 2006, the North Carolina Court of Appeals issued a written opinion, affirming the conviction and sentence. *State v. Bauberger*, 176 N.C.App. 465, 626 S.E.2d 700 (2006). Judge Geer filed a dissenting opinion. On April 3, 2006, Petitioner filed a notice of appeal to the North Carolina Supreme Court based on the dissent, and a petition for review on a sen-

tencing issue. On June 29, 2006, the North Carolina Supreme Court denied discretionary review of all issues except for those presented in the dissenting opinion. *State v. Bauberger*, 360 N.C. 537, 634 S.E.2d 218 (2006). Then, on December 15, 2006, the North Carolina Supreme Court affirmed on a split vote, with three justices voting to affirm, three justices voting to reverse, and one justice abstaining.[1] *State v. Bauberger*, 361 N.C. 105, 637 S.E.2d 536 (2006). Petitioner filed this federal habeas petition on January 4, 2008, and he is represented by counsel.

## II. Petitioner's Claims

In his federal habeas petition, Petitioner's sole federal habeas ground for relief is that his Sixth and Fourteenth Amendment rights to an impartial jury, to confrontation, and to be present at all critical stages of his trial were denied because the jury consulted an extrinsic source that confused the crucial difference between the intent elements of second-degree murder and involuntary manslaughter. To support this contention, Petitioner asserts:

> During a lunch break in the midst of jury deliberations, the jury foreman checked out a dictionary from the public library and proceeded to share definitions of the terms used to define malice, the essential element that differentiates second degree murder from involuntary manslaughter. The dictionary definitions for "recklessly" and "wantonly," two of the key terms used by the pattern jury instructions to define malice, had the effect of lowering the burden of proof on this essential element. Another juror looked up the word "malice" in the dictionary at home the night before the deliberations began.

---

1. The North Carolina Supreme Court noted in its order of December 15, 2006, that the Court of Appeals decision was therefore left

undisturbed but without precedential value. *State v. Bauberger*, 361 N.C. 105, 637 S.E.2d 536 (2006).

The jurors had twice made it clear that they were having trouble understanding the meaning of the word malice by writing notes to the trial judge seeking clarification. The result was a seven to five deadlock that was only broken after an *Allen* charge.

(*See* Petition, p. 6, docket no. 1.)

### Facts

Petitioner caused a fatal automobile accident on February 3, 2002, after consuming at least ten beers at a Super Bowl party.[2] *Bauberger,* 176 N.C.App. at 466, 626 S.E.2d at 702. While driving from the party to a friend's house, Petitioner drove the wrong way down an exit ramp of U.S. Highway 421, outside of Winston–Salem. *Id.* at 466, 626 S.E.2d at 702. While driving the wrong way down the ramp, his car collided with a car driven by William Foy. *Id.* Mr. Foy's wife, Carol, died within minutes of the crash. *Id.* at 467, 626 S.E.2d at 702. Petitioner was also injured in the accident and was treated at a hospital for his injuries. *Id.*

Petitioner accepted responsibility for the accident and conceded that he was guilty of involuntary manslaughter. (*See* Pet.'s Br., Ex. 1, Vol. I, tr. 27–28, docket no. 3.) He pled not guilty, however, to the second-degree murder charge. The only issue for the jury, in determining whether to convict Petitioner of second-degree murder, or of the lesser-included offense of involuntary manslaughter, was whether the State proved that Petitioner acted with malice. The State presented evidence at trial to show that Petitioner had acted with malice in causing Mrs. Foy's death, including, for instance: Petitioner's admission to driving with a blood alcohol concentration of .20 on the night of the crash; that Petitioner had at least two prior DWI convictions, as well

as prior reckless driving and other driving offenses; Petitioner's disregard of roadway signs and other warnings on the night of the fatal crash and that he was driving in a careless and reckless manner; Petitioner's disregard of prior state court orders not to drive; Petitioner's profane attitude to EMS and others at the scene; and that Petitioner was driving with a revoked license on the night of the crash. (*See* Petition, MAR Order, Pet.'s Ex. 1, pp. 5–6, docket no. 1.)

At trial, the Assistant District Attorney who prosecuted the case acknowledged that proving malice would be a challenge. During a hearing on preliminary motions, he stated to the court:

And we have to prove a very difficult mental [element] in this case, as the Court knows, the element of implied malice, and that has got a lengthy definition the Court has to give to the jury about what malice means as a person intentionally committing an inherently dangerous act and there—at the time that they were basically *intentionally reckless,* and that they exhibited—inherently—mischief, and I[am] more or less paraphrasing to you. . . .

(Pet.'s Br., Ex. 1, Vol. I, tr. 14–15 (emphasis added), docket no. 3.)

In its charge to the jury, the trial court defined the word "malice" in accordance with the North Carolina Pattern Jury Instructions:

Now, let me go back to the fifth element of second degree murder that the State must prove. That fifth element is that the defendant acted unlawfully and *with malice. Malice is a necessary element which distinguishes second degree murder from manslaughter.* Malice arises

---

**2.** Many of the factual determinations set forth here were made by the North Carolina Court of Appeals and are therefore presumed to be correct on habeas review. *See* 28 U.S.C. § 2254(e)(1). In any event, the relevant facts in this case are not in dispute.

when an act which is inherently dangerous to human life is intentionally done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief.

(Pet.'s Br., Ex. 3, Vol. IV, tr. 22–23.) The trial court also instructed the jury on "culpable negligence," the crucial element of the lesser-included offense of involuntary manslaughter:

[The State must prove that] the defendant's violations of law governing the operation of a motor vehicle constituted culpable negligence. Such violation will constitute culpable negligence if the violation is willful, wanton, or intentional, but where there is an unintentional or inadvertent violation of the law, such violation[ ] standing alone does not constitute culpable negligence. To constitute culpable negligence, the inadvertent or unintentional violation of the law must be accompanied by recklessness of probable consequences of a dangerous nature when tested by the rule of reasonable foresight amounting altogether to a thoughtless disregard of consequences or a heedless indifference to the safety of others.

(Pet.'s Br., Ex. 3, Vol. IV, tr. 24.) During the trial, the trial judge repeatedly instructed the jurors that they were required to consider the law only as given by the court. (*See* Pet.'s Br., Ex. 1, Vol. I, tr. 32, 36, 37; Ex. 3, Vol. IV, tr. 11–12.)

It is undisputed that during the deliberations the jury struggled over whether Petitioner had acted with malice. As noted, malice was the only distinguishing element between second-degree murder and involuntary manslaughter, and Petitioner conceded that he was guilty of involuntary manslaughter. Shortly after the jury began its deliberations, the jurors sent a note to the judge, which stated:

"We, the jury would like to have a copy of the law, as shown to us, about the elements of 2nd degree murder. Also we would like a copy of the law concerning manslaughter. . . ."

(Pet.'s Br., Ex. 4, R.App., p. 28.) Almost thirty minutes later, the jury sent another note to the judge, stating:

We, the jury, would like a copy of *the fifth element* of 2nd degree murder [i.e., that the defendant acted unlawfully and with malice]. If the defense does not stipulate that the other elements were present, we would like a copy of the other elements read to us during the jury instructions. Many of us are visual people. Thank you.

(Pet.'s Br., Ex. 4, R.App., p. 29 (emphasis added).) The trial judge promised the jurors that they would receive copies of the elements of second-degree murder and involuntary manslaughter after they returned from their lunch break. (Pet.'s Br., Ex. 3, Vol. IV, tr. 45–46.)

During the jury's lunch break, the jury foreman went to the Forsyth County Public Library and checked out a copy of Webster's New Collegiate Dictionary (1953 edition), which he took into the jury room after lunch. *Bauberger*, 176 N.C.App. at 468–69, 626 S.E.2d at 703. The jury foreman looked up the meaning of certain words that were in the judge's instructions regarding the meaning of the word "malice." The trial judge had instructed the jury on the following definition of "malice": "Malice arises when an act which is inherently dangerous to human life is intentionally done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief." *Id.* at 469, 626 S.E.2d at 703 & n. 1. After lunch when deliberations resumed, the jury foreman shared the following dictionary definitions with the other jurors:

(1) "recklessly" was defined as "lack of due caution"

(2) "wantonly" was defined as "arrogant recklessness of justice or the feelings of others"

(3) "manifest" was defined as "show"

(4) "utterly" was defined as "fully, totally"

(5) "regard" was defined as "respect or consideration for"

*Id.*

The jurors deliberated for two more hours after lunch and then informed the court that they were deadlocked seven to five on the issue of malice. (Pet.'s Br., Ex. 3, Vol. IV, tr. 51.) The court gave the jury an *Allen* charge, and deliberations resumed for another two hours. (*Id.*, tr. 51–52.) The jury then returned a verdict finding Petitioner guilty of second-degree murder and assault with a deadly weapon inflicting serious injury. (*Id.*, tr. pp. 57–58.)

It is also undisputed that, in addition to the fact that the jury foreman checked out a dictionary from the library to bring to the deliberations, one of the other jurors also admitted that on the night before deliberations began, he looked up the definition of "malice" in a dictionary at his home. *Bauberger*, 176 N.C.App. at 468, 626 S.E.2d at 703. The juror stated, however, that he could not remember during the deliberations what the definition said and that he did not share it with anyone else on the jury. *Id.*

Soon after the jury announced its verdict, the trial court was notified that the jury may have consulted a dictionary during deliberations to interpret the definition of "malice." *See id.* Based on the jury's consultation of a dictionary during deliberations, Petitioner filed an MAR three days after his sentencing. *See id.* The MAR court denied the motion, finding that although the jury's consultation of a dictionary during deliberations was improper, it did not prejudice Petitioner. Therefore, Petitioner's Sixth Amendment rights were not violated. (Petition, Ex. 1, MAR Order, p. 6.)

### The North Carolina Court of Appeals Decision

On appeal from the decision of the MAR court and from Petitioner's conviction and sentence, a majority of the North Carolina Court of Appeals affirmed. The North Carolina Court of Appeals addressed Petitioner's Sixth Amendment claim in the following manner:

Defendant next contends that the jury's consultation of dictionary definitions violated his Sixth Amendment right to confront witnesses against him . . . .

"The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *State v. Nobles*, 357 N.C. 433, 435, 584 S.E.2d 765, 768 (2003) (internal quotations omitted). Thus, the Sixth Amendment provides the criminal defendant the right to confront witnesses and evidence against him. *See, e.g., State v. Lyles*, 94 N.C.App. 240, 247, 380 S.E.2d 390, 394–95 (1989). In *Lyles*, the jury improperly peeled back paper that was covering a notation on a photographic exhibit, revealing that the defendant had been present at the police station on a date when his alibi witnesses testified that the defendant lived in another state. *Id.* at 243, 380 S.E.2d at 392. This Court considered the circumstances under which the jury received this information and concluded that the defendant's right to confrontation was violated[:]

In this case, it is undisputed that information about the defendant, which had not been admitted into evidence, came to the attention of the jury and

that this evidence directly contradicted defendant's alibi witnesses. Because this exposure occurred during the jury's deliberations, defendant had no opportunity to challenge the evidence by cross-examination or to minimize its impact in his closing argument or through a curative instruction by the trial judge. Moreover, the evidence implied that defendant had prior criminal involvement, and the jury was allowed to draw this inference notwithstanding that this is a subject intricately regulated by the rules of evidence.

*Id.* at 247, 380 S.E.2d at 395. *Here, the information considered by the jury did not discredit defendant's testimony or witnesses; it concerned legal terminology, not evidence developed at trial. Under these circumstances, the juror misconduct did not violate defendant's right to confrontation.* Cf. *State v. Hines,* 131 N.C.App. 457, 508 S.E.2d 310 (1998) (defendant's right to confrontation violated where prosecutor's notes and typewritten list of statements defendant made, including hearsay statements, were mistakenly published to the jury without being admitted into evidence). We hold that the trial court did not err in concluding that the affidavits did not contain extraneous information and that defendant's right to confrontation was not violated by the juror misconduct.

*Bauberger,* 176 N.C.App. at 472–73, 626 S.E.2d at 705–06 (emphasis added).

### III. Standard of Review

#### A. Summary Judgment

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.,* 135 F.3d 911, 913 (4th Cir.1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.,* 48 F.3d 810, 817 (4th Cir.1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.,* 477 U.S. at 331, 106 S.Ct. 2548 (Brennan, J., dissenting). When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick,* 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 196 (4th Cir.1997).

It is too glib, however, simply to say that the standard formulation for assessing summary judgment in the run-of-the-mill civil case applies in all habeas cases. For example, the usual summary judgment analysis contemplates accepting the evidence and all justifiable inferences from the evidence in the light most favorable to the non-movant. In the habeas context, however, if there is a contention that the evidence at trial does not support the underlying conviction, the appropriate standard calls for viewing the evidence in the light most favorable to the prosecution and according the prosecution the benefit of all

reasonable inferences from the evidence and, in that light, determining if any rational trier of fact could have found the petitioner guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

By way of another example, in a habeas claim of ineffective assistance of counsel, a federal court "must indulge a strong presumption that counsel's conduct was reasonable, and ... the petitioner must overcome the presumption that the challenged conduct may have been sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Nevertheless, the point is that habeas cases are subject to a summary judgment analysis as are all civil cases. *See* Rule 11, Rules Governing Section 2254 Cases In The United States District Courts; *see also Maynard v. Dixon*, 943 F.2d 407, 412–13 (4th Cir.1991) (FED.R.CIV.P. 56 applies to habeas proceedings); *but cf.* 17B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, VIKRAM DAVID AMAR, FEDERAL PRACTICE AND PROCEDURE § 4268 (2d ed. 1988) ("The procedure of applications for habeas corpus for state prisoners is a confusing amalgam, to be found in a variety of different sources. There are a number of procedural provisions in the habeas corpus statutes themselves.").

### B. Section 2254

Section 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a deci-

sion that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(2000). In addition, factual determinations made by a state court are afforded a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1).

■ Section 2254 precludes *de novo* federal habeas corpus review of state court decisions on the merits of a petitioner's claim. *Bell v. Jarvis*, 236 F.3d 149, 159–60 (4th Cir.2000) (en banc) (overruling *Cardwell v. Greene*, 152 F.3d 331, 339 (4th Cir.1998)). When faced with a state court decision that does not explicitly cite or apply federal law, the habeas court should conduct an "independent examination of the record and the clearly established Supreme Court law." *Bell*, 236 F.3d at 158. Nevertheless, the habeas court must still confine its review to whether the "result" of the state court decision "is legally or factually unreasonable." *Id.* at 163 (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir.1999)); *see also Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) ("Avoiding these pitfalls does not require citation of our cases—indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the *result* of the state-court decision contradicts them." (first emphasis in original, second emphasis added)).

■ A state court decision is contrary to Supreme Court precedent if it arrives at a conclusion opposite that of the Supreme Court on a question of law or decides the case differently from Supreme Court precedent based on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is an unreasonable application of Supreme Court law "when a state-court decision unreasonably applies the law of [the Su-

preme] Court to the facts of a prisoner's case." *Id.* at 409, 120 S.Ct. 1495. The "unreasonable application" standard does not admit of easy definition. For example, Justice O'Connor, writing for a majority of the Court, has said that "[t]he term 'unreasonable' is no doubt difficult to define." *Williams,* 529 U.S. at 410, 120 S.Ct. 1495. Nevertheless, more recently the Supreme Court has said that the

> unreasonable application prong of § 2254(d)(1) permits a federal habeas court to grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case. In other words, a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced. In order for a federal court to find a state court's application of our precedent unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable.

*Wiggins v. Smith,* 539 U.S. 510, 520–21, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citations omitted); *see also Penry v. Johnson,* 532 U.S. 782, 793, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (stating that even if the habeas court determines that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if the application was also objectively unreasonable); *Williams,* 529 U.S. at 410, 120 S.Ct. 1495 (stating that an *unreasonable* application of federal law is different from an *incorrect* application of federal law).

Finally, even if the state court's adjudication is contrary to or an unreasonable application of Supreme Court precedent, a federal habeas court may not grant relief unless the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Penry,* 532 U.S. at 795, 121 S.Ct. 1910 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). While the AEDPA standard is difficult to overcome, "[t]he standard is demanding but not insatiable ... '[d]eference does not by definition preclude relief.'" *Miller–El v. Dretke ("Miller–El II"),* 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (quoting *Miller–El v. Cockrell ("Miller–El I"),* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)). These standards will guide the analysis below.

## IV. Discussion

### A. Whether the State Court Adjudication Was Contrary to or an Unreasonable Application of Clearly Established Supreme Court Law

### 1. Which State Court Adjudication Is to Be Reviewed

The first issue before this court on habeas review is whether the court should review the MAR court's adjudication on February 4, 2004, of Petitioner's Sixth Amendment claim, or the North Carolina Court of Appeals' adjudication on March 7, 2006, of Petitioner's Sixth Amendment claim. Respondent assumes in its brief that this court is reviewing the MAR court's decision. In Petitioner's brief in opposition, however, Petitioner notes that, in denying relief to Petitioner, the North Carolina Court of Appeals issued the last reasoned opinion on Petitioner's Sixth Amendment claim. *See Parker v. Gladden,* 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (per curiam). Petitioner contends that it is therefore the North Carolina Court of Appeals decision that serves as the state court adjudication for purposes of AEDPA review. *See also Ylst*

*v. Nunnemaker*, 501 U.S. 797, 804, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). I agree. Accordingly, this court must determine whether the decision of the North Carolina Court of Appeals was contrary to or an unreasonable application of clearly established Supreme Court law, or whether it was an unreasonable determination of the facts in light of the evidence presented to the court.

### 2. Sixth Amendment Rights to Confrontation and to an Impartial Jury

 The Sixth Amendment states, in pertinent part:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ... and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defen[s]e.

U.S. CONST. amend. VI.[3] One of the most basic rights guaranteed by the Sixth Amendment is the right of the accused to be present at every stage of his trial. *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). In addition, the concept of a jury trial, fundamental to this country's constitutional system of criminal justice, includes the idea that the jury conducts its deliberations under the supervision of a judge who instructs them on the relevant law. *Capital Traction Co. v. Hof*, 174 U.S. 1, 13–14, 19 S.Ct. 580, 43 L.Ed. 873 (1899). One of the basic tenets of the right to a trial by jury, in turn, is that the defendant is entitled to be present when the jury receives instructions regarding the law. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422,

462, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) (holding that it was reversible error for the trial judge to engage in ex parte communications with the jury foreman, which amounted to supplemental instructions to the jury, without opportunity for counsel for the defense to clear up any confusion those supplemental instructions may have caused). Any outside source that influences the jury's understanding of the fundamental terms of the jury charge and the accused's defense that is not aired in the defendant's presence is a clear violation of the defendant's Sixth Amendment rights. *Rogers v. United States*, 422 U.S. 35, 38–40, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) (where the trial court, without notice to defendant and out of his presence, answered a question from the jury related to the jury verdict).

 The U.S. Supreme Court has also observed that stated communications, or "private talk," between an outside party and the jury may constitute an "outside influence" that therefore implicates the Sixth Amendment. *Parker v. Gladden*, 385 U.S. 363, 364–65, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). Outside influences are constitutionally suspect because they are not subject to full judicial protection of the defendant's Sixth Amendment rights to confrontation and cross-examination. *See id.* Moreover, even if only one juror's impartiality is overcome by an improper extraneous influence, the defendant's right to an impartial jury has been denied. *Id.* at 366, 87 S.Ct. 468 ("[P]etitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.").

Despite these protections afforded by the Sixth Amendment, the U.S. Supreme Court has stated that the Sixth Amend-

---

**3.** The U.S. Supreme Court has held that the Fourteenth Amendment makes the Confrontation Clause and Impartial Jury guarantees of the Sixth Amendment obligatory upon the States. *See, e.g., Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

ment does not require that the courts consider *all* matters introduced by the defendant tending to impeach the jury's verdict. *See Tanner v. United States,* 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). Indeed, the common law generally *prohibits* the admission of juror testimony to impeach a jury verdict. *See McDonald v. Pless,* 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). The rationale behind the common law rule is that if

> verdicts solemnly made and publicly returned into court [could] be attacked and set aside on the testimony of those who took part in their publication [then] all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all

frankness and freedom of discussion and conference.

*Id.* at 267–68, 35 S.Ct. 783.

The common law rule has been codified in Rule 606(b) of the Federal Rules of Evidence and in many states' rules of evidence, including North Carolina's.[4] Like the common law, the Federal Rules of Evidence and the North Carolina Rules of Evidence contain an exception to this general rule when "extraneous prejudicial information" is improperly brought to the jury's attention or when an "outside influence [is] improperly brought to bear upon any juror." FED.R.EVID. 606(b); N.C. GEN. STAT. § 8C–1, Rule 606(b) (2003).

### 3. Clearly Established Supreme Court Law Applying Sixth Amendment Rights in Light of the Common Law Rule Regarding Jury Impeachment

The U.S. Supreme Court has issued a line of cases addressing Sixth Amendment rights in light of the common law rule and its exceptions. For instance, in *Mattox v. United States,* the Supreme Court held that a juror "may testify to any facts bear-

---

4. Federal Rule of Evidence 606(b) provides:

> (b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

FED.R.EVID. 606(b). North Carolina Rule of Evidence 606(b) is almost identical to its federal counterpart. *See* N.C. GEN.STAT. § 8C–1, Rule 606(b) (2003). North Carolina law also provides:

> (a) Upon an inquiry into the validity of a verdict, no evidence may be received to show the effect of any statement, conduct, event, or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined .... (c) After the jury has dispersed, the testimony of a juror may be received to impeach the verdict of the jury on which he served, subject to the limitations in subsection (a), only when it concerns: (1) Matters not in evidence which came to the attention of one or more jurors under circumstances which would violate the defendant's constitutional right to confront the witnesses against him; or (2) Bribery, intimidation, or attempted bribery or intimidation of a juror.

N.C. GEN STAT. § 15A–1240 (2003).

ing upon the question of the existence of any extraneous influence." 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892). In *Mattox,* the Court allowed jurors to testify that the jury had been exposed to a newspaper article containing prejudicial information about the defendant and that a bailiff had told the jury about other crimes that the defendant had committed. *Id.* at 142–43, 13 S.Ct. 50. The Court stated that, although a juror could testify as to the *existence* of the influence, the juror could *not* testify "as to how far that influence operated upon his mind," because such testimony would impermissibly relate to the juror's subjective mental processes. *Id.* at 149, 13 S.Ct. 50.

Then, in *Remmer v. United States,* the Supreme Court permitted juror testimony as to whether a third party had tried to bribe the jury's foreman. 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). In *Remmer,* after the jury had returned its verdict, the defendant learned for the first time that during the trial someone had contacted a juror, who later became the foreman, and tried to bribe him in order to render a favorable verdict to the defendant. *Id.* at 228, 74 S.Ct. 450. The defendant also found out the FBI had been called in to investigate the attempted bribe. *Id.* The Supreme Court held that the defendant was entitled to a hearing on whether the attempted bribe had prejudiced the defendant. *Id.* at 230, 74 S.Ct. 450. The Court observed that:

> [i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Id.* at 229, 74 S.Ct. 450.

In *Turner v. Louisiana,* two deputy sheriffs who were key prosecution witnesses were also responsible for sequestering the jury during the defendant's trial. 379 U.S. 466, 467, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). The deputies ate meals with the jury, talked to them, and ran errands for them. *Id.* at 468, 85 S.Ct. 546. The Supreme Court held that the deputy sheriffs' associations with the jury had tainted the jury process by creating the risk that the jurors would make their determinations about the deputy sheriffs' credibility as witnesses outside of the courtroom, therefore eliminating the defendant's ability to cross-examine the deputy sheriffs effectively. *See id.* at 473, 85 S.Ct. 546.

Next, in *Parker v. Gladden,* the petitioner filed a state habeas petition after being convicted for second-degree murder. 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). At the hearing on the petition, the trial court found that a court bailiff had stated to one of the jurors, in the presence of other jurors, "Oh that wicked fellow (petitioner), he is guilty," and that "[i]f there is anything wrong (in finding petitioner guilty) the Supreme Court will correct it." *See id.* at 363–64, 87 S.Ct. 468. Both statements were overheard by at least one regular juror or an alternate. *Id.* at 364, 87 S.Ct. 468. The trial court found that the bailiff's statements were prejudicial to the petitioner. *Id.* The Oregon Supreme Court reversed, finding that the bailiff's misconduct did not deprive the petitioner of his Sixth Amendment rights. *Id.* The U.S. Supreme Court granted certiorari and reversed.

In its opinion, the U.S. Supreme Court first observed that the bailiff's statements

to the jury were clearly governed by the Sixth Amendment, stating:

> We believe that the statements of the bailiff to the jurors are controlled by the command of the Sixth Amendment, made applicable to the States through the Due Process Clause of the Fourteenth Amendment. It guarantees that 'the accused shall enjoy the right to a ... trial, by an impartial jury ... (and) be confronted with the witnesses against him....' As we said in *Turner v. State of Louisiana*, 379 U.S. 466, 472–473, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), 'the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.' Here there is dispute neither as to what the bailiff, an officer of the State, said nor that when he said it he was not subjected to confrontation, cross-examination or other safeguards guaranteed to the petitioner. Rather, his expressions were 'private talk,' tending to reach the jury by 'outside influence.' *Patterson v. People of State of Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907). We have followed the 'undeviating rule,' *Sheppard v. Maxwell*, 384 U.S. 333, 351, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), that the rights of confrontation and cross-examination are among the fundamental requirements of a constitutionally fair trial. *Kirby v. United States*, 174 U.S. 47, 55, 56, 19 S.Ct. 574, 43 L.Ed. 890 (1899); *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *Pointer v. State of Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

*Id.* at 364–65, 87 S.Ct. 468 (parallel citations omitted).

The State argued that no prejudice was shown and no harm could have resulted because ten members of the jury testified that they had not heard the bailiff's statements. The State further noted that Oregon law permits a verdict of guilty by ten affirmative votes. *Id.* at 365, 87 S.Ct. 468. The Supreme Court rejected the State's arguments:

> This [argument] overlooks the fact that the official character of the bailiff-as an officer of the court as well as the State-beyond question carries great weight with a jury which he had been shepherding for eight days and nights. Moreover, the jurors deliberated for 26 hours, indicating a difference among them as to the guilt of petitioner. Finally, one of the jurors testified that she was prejudiced by the statements, which supports the trial court's finding 'that the unauthorized communication was prejudicial and that such conduct materially affected the rights of the defendant.' This finding was not upset by Oregon's highest court. Aside from this, we believe that the unauthorized conduct of the bailiff 'involves such a probability that prejudice will result that it is deemed inherently lacking in due process,' *Estes v. State of Texas*, 381 U.S. 532, 542–543, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). As we said in *Turner v. State of Louisiana*, ... 'it would be blinking reality not to recognize the extreme prejudice inherent' in such statements that reached at least three members of the jury and one alternate member. 379 U.S., at 473, 85 S.Ct., at 550. The State says that 10 of the jurors testified that they had not heard the statements of the bailiff. This, however, ignores the testimony that one of the statements was made to an unidentif[i]ed juror, which, including Mrs. Inwards and Mrs. Drake, makes three. In any event, petitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.

*Id.* at 365–66, 87 S.Ct. 468 (footnote and parallel citations omitted).

Next, in *Tanner v. United States*, the defendant sought an evidentiary hearing so that he could examine the jurors' alleged drug and alcohol use during trial. 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). The Supreme Court denied relief to the defendant, essentially concluding that providing a hearing on the jury's intoxication during deliberations would allow the defendant to inquire "into the internal processes of the jury." *See id.* at 120, 107 S.Ct. 2739. The Court stated that "drugs or alcohol voluntarily ingested by a juror seems no more an 'outside influence' than a virus, poorly prepared food, or a lack of sleep." *Id.* at 122, 107 S.Ct. 2739. The Court also examined the legislative history of Federal Rule of Evidence 606(b) and noted that Congress had specifically refused to expand Rule 606(b) to allow inquiry into matters that relate to the internal processes of the jury, and that Congress had used jury intoxication as one example of a matter that related to the internal processes of the jury. *Id.* at 122–23, 107 S.Ct. 2739.

In sum, the Supreme Court has clearly recognized that while extraneous influences are barred by the Sixth Amendment, influences internal to the deliberation process are not. In other words, the Supreme Court law is that a defendant may not show that a jury violated his Sixth Amendment rights to confrontation and to an impartial jury by pointing to matters that are internal to the jury's deliberation process (i.e., jury intoxication). A defendant may, however, show that his Sixth Amendment rights were violated by pointing to external influences (i.e., private communications by third parties). Indeed, as the Fourth Circuit correctly recognized in *Robinson v. Polk*, under the Supreme Court law as established in *Tanner* and other cases, the Sixth Amendment "do[es] not require judicial consideration of juror allegations regarding influences internal to the deliberation process." *Robinson v.*

*Polk*, 438 F.3d 350, 363 (4th Cir.2006). The Fourth Circuit in *Robinson* further stated that under clearly established Supreme Court law,

an influence is not an internal one if it (1) is extraneous prejudicial information; i.e., information that was not admitted into evidence but nevertheless bears on a fact at issue in the case, *see Parker*, 385 U.S. at 364, 87 S.Ct. 468; *Turner*, 379 U.S. at 473, 85 S.Ct. 546, or (2) is an outside influence upon the partiality of the jury, such as "private communication, contact, or tampering . . . with a juror," *Remmer*, 347 U.S. at 229, 74 S.Ct. 450.

*Id.* (parallel citations omitted).

Here, Petitioner contended in the state courts that his Sixth Amendment rights were violated because the jury consulted a dictionary in attempting to interpret the meaning of "malice." Respondent contends that the state court adjudication was not contrary to or an unreasonable application of clearly established Supreme Court law. Respondent's argument fails because it is based on two faulty premises. First, Respondent incorrectly argues in its brief that the North Carolina Court of Appeals concluded that Petitioner's Sixth Amendment rights were not violated on the ground that the dictionary reading did not constitute an extraneous influence on the jury. (*See* Respondent's Br. 12.) Respondent then observes that the U.S. Supreme Court has never held whether a dictionary is an extraneous influence or an internal influence. It follows, argues Respondent, that the North Carolina Court of Appeals decision was neither contrary to nor an unreasonable application of clearly established Supreme Court law. (*See* Respondent's Br. 9.)

First, and most significant, the state court's adjudication of the Sixth Amendment claim *did not* rest on a conclusion

that a dictionary is an internal influence like the use of drugs and alcohol were deemed to be internal influences under *Tanner.*[5] Rather, the state court concluded that the dictionary information was mere legal terminology, not evidence presented at trial, and therefore the jury's consultation of it did not violate Petitioner's Sixth Amendment rights. More specifically, the North Carolina Court of Appeals stated:

> Here, the information considered by the jury did not discredit defendant's testimony or witnesses; it concerned legal terminology, not evidence developed at trial.

*Bauberger,* 176 N.C.App. at 473, 626 S.E.2d at 706. Based on this finding, the court concluded that the jury's consultation of dictionary definitions did not violate Petitioner's Sixth Amendment right to confrontation. This holding was an unreasonable application of clearly established Supreme Court law.[6] That is, to interpret the clearly established Supreme Court Sixth Amendment cases as holding that *no*

*misconduct occurs* when a jury consults a dictionary during deliberations in interpreting jury instructions is most certainly an unreasonable application of clearly established Supreme Court law.[7] As Petitioner points out in his brief, under the state court's incorrect reading of the Sixth Amendment, it would not violate a defendant's constitutional rights for a judge or prosecutor to provide a jury with a dictionary, encyclopedia, or treatise that contained an alternative definition of a crucial element in the case, without the knowledge of and outside of the presence of a defendant, merely because the information could be categorized as "legal terminology" and not "evidence developed at trial." The United States Supreme Court has never interpreted the Sixth Amendment in this manner. As to the state court's finding that the Sixth Amendment was not implicated because the dictionary definitions did not concern "evidence developed at trial," this part of the court's holding has absolutely no basis in the Supreme Court Sixth

---

**5.** The North Carolina Court of Appeals determined that dictionaries were not "external" information under prior *state* law, but that finding was not part of the court's Sixth Amendment analysis. That is, the Court of Appeals determined that "definitions in standard dictionaries are not within *[the North Carolina] Supreme Court's* contemplation of extraneous information." *Bauberger,* 176 N.C.App. at 471, 626 S.E.2d at 705 (emphasis added).

**6.** Moreover, the Fourth Circuit has clearly held that the consultation of a dictionary constitutes "an external, rather than an internal influence." *United States v. Duncan,* 598 F.2d 839, 866 (4th Cir.1979); *see also McNeill v. Polk,* 476 F.3d 206, 226 (4th Cir.2007) (King, J., concurring) (citing *Duncan,* stating that "[a juror's] use of his home dictionary, in this setting, constituted an external, rather than an internal, influence").

**7.** In other words, despite the state court's characterization twice in its opinion of the

jury's consultation of a dictionary as "misconduct," the court undeniably concluded that *no misconduct occurred.* That is, if it *was* misconduct to consult the dictionary in order to ascertain the meanings of words in the trial court's instructions, then the state court had an obligation to determine whether the misconduct prejudiced Petitioner. As noted, the state court never assessed the prejudice prong—thus indicating that it concluded that there *was no* jury misconduct. To make the point another way, it is well established that the general knowledge, opinions, and feelings that a juror carries into a jury room are properly considered during jury deliberations. *See Fields v. Brown,* 503 F.3d 755, 778–80 (9th Cir.2007). Therefore, regardless of whether these matters prejudice the jury, they are allowed because they are simply *not* misconduct. Similarly, according to the North Carolina Court of Appeals' faulty logic, if material is "legal terminology," rather than evidence, then it is also properly considered during jury deliberations, regardless of whether it prejudices the jury's verdict.

Amendment law regarding extraneous information and jury impeachment.[8]

Moreover, the mere fact that the U.S. Supreme Court has not yet definitively held that a dictionary is an "extraneous" influence does not mean that the state court's adjudication was necessarily a *reasonable* application of Supreme Court law. That is, although there does not appear to be a Supreme Court opinion with indistinguishable facts, the clearly established Supreme Court law is that extraneous influences, i.e., influences that do not relate to the jury's internal processes (and regardless of whether those extraneous influences constitute mere "legal terminology"), simply may not inform the jury's decision, particularly where those extraneous influences contradict the trial court's instructions on an essential element of a crime.[9] Thus, I agree with Petitioner that the *Teague* line of cases does not require a case involving identical facts, circumstances, and legal issues. *Accord Fields v. Brown*, 503 F.3d 755, 778–79 (9th Cir.2007) (noting that where the jury had read various Bible passages in a capital case, review of the petitioner's claims were not *Teague*-barred merely because the Supreme Court has not addressed a case on indistinguishable facts). Rather, the Sixth Amendment inquiry in the context of outside influence on a jury is fact-specific. *Id.* Among other things, it requires a reviewing court to determine whether the particular materials that a juror brought into the jury room are extraneous materials, or are merely "the kind of common knowledge which most jurors are presumed to possess." *Rodriguez v. Marshall*, 125 F.3d 739, 745

(9th Cir.1997), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 828–29 & n. 11 (9th Cir.2002) (en banc). Here, the very fact that the jurors wished to consult a dictionary to determine the meaning of a word used in a jury instruction indicates that dictionary definitions are not common knowledge that most jurors are presumed to possess. In sum, I find that the North Carolina Court of Appeals' adjudication of Petitioner's Sixth Amendment claim was an unreasonable application of clearly established Supreme Court law.

Finally, I recognize that the Fourth Circuit held, in *Robinson v. Polk*, that a state court's adjudication was neither contrary to nor an unreasonable application of clearly established Supreme Court law where the state court concluded that the jury's reading of certain Bible passages during sentencing deliberations in a capital case did not violate the petitioner's Sixth Amendment rights. *See Robinson*, 438 F.3d at 364. The Fourth Circuit pronounced that under the clearly established Supreme Court law as established in *Tanner*, the Sixth Amendment "do[es] not require judicial consideration of juror allegations regarding influences internal to the deliberation process." *Id.* at 363. The majority opined that the Bible was arguably an "internal" influence within the meaning of clearly established Supreme Court law because "reading the Bible is analogous to the situation where a juror quotes the Bible from memory, which assuredly would not be considered an improper influence." *Id.* at 364. The major-

---

8. Indeed, the very nature of "extraneous information" is that it is *not* evidence developed at trial. Therefore, the fact that some outside matter, such as communication from a third party or a dictionary definition, is not evidence developed at trial, does not insulate it from Sixth Amendment protections—in fact, quite the opposite is true.

9. Courts often use the words "extraneous," "extrinsic," and "external" interchangeably in discussing influences that do not relate to the internal thought processes of a jury. Similarly, in using these words interchangeably in this Recommendation, these words are meant to refer to influences that do not relate to the internal thought processes of the jury.

ity further found that whether the Bible constitutes an external or an internal influence is therefore not clearly established under Supreme Court law, noting that "the reading of Bible passages invites the listener to examine his or her own conscience from within." *Id.* at 363. The Fourth Circuit concluded that it would therefore have been "reasonable for the [state] court to conclude that the Bible is not analogous to a private communication, contact, or tampering with a juror, and that the common-law rule against allowing juror testimony applied." *Id.*

Citing *Robinson,* Respondent states in its brief that "[a]s with allegations of juror Bible reading during jury deliberations, Petitioner has . . . cited, and Respondent's research has unearthed, no United States Supreme Court case addressing whether allegations of juror dictionary reading . . . constitut[es] extraneous, as opposed to internal, influences on the jury." (Respondent's Br. 9.) Respondent contends that the state court adjudication must therefore have been reasonable. This argument has no merit. That is, it also appears that the U.S. Supreme Court has never held definitely that it is misconduct for a juror to bring from his home his own copy of jury instructions so that he may use them to substitute or supplement the jury instructions given by the court. To uphold this conduct as proper, however, would constitute an unreasonable application of clearly established Supreme Court law. Moreover, while the Fourth Circuit stated that it might be reasonable to conclude that consulting Bible passages relates to the internal processes of the jury, the same argument cannot be made about consulting a dictionary in an attempt to interpret jury instructions. Relying on a dictionary meaning that arguably lowers the State's burden of proof on an essential element of a crime cannot be reasonably categorized as a juror examining "his or her own conscience from within." *Cf. Robinson,* 438

F.3d at 363. Moreover, to rely on a dictionary definition of an essential element (specifically, *the* essential element in the alleged crime in this case), is clearly straying from the instructions given by the trial judge. Indeed, as the dissent in the North Carolina Court of Appeals decision noted, the "universal rule appears to be that a dictionary constitutes extraneous material that may not be consulted by a jury." *Bauberger,* 176 N.C.App. at 477, 626 S.E.2d at 708 (Geer, J., dissenting) (collecting cases); *see also Marino v. Vasquez,* 812 F.2d 499, 504–06 (9th Cir.1987) (holding that consulting a dictionary definition for the meaning of "malice" constituted the consideration of extrinsic information, finding prejudice under the *Chapman* harmless error standard, and affirming the district court's grant of conditional habeas relief).

In sum, to be sure it is by now clearly established under the Supreme Court's Sixth Amendment cases that the mere fact that an influence is "legal terminology" does not immunize it from the Sixth Amendment. Rather, the clearly established Supreme Court law is that extraneous influences, i.e., influences that do not relate to the jury's internal processes (and regardless of whether those extraneous influences constitute mere "legal terminology"), simply may not inform the jury's decision, particularly where those external influences contradict the trial court's instructions on an essential element of a crime. For all these reasons, I find that the state court adjudication was an unreasonable application of clearly established Supreme Court law.

## B. Prejudice under Brecht

Even if a state court adjudication is an unreasonable application of clearly established Supreme Court law, a petition may still not be granted unless the error of

which a petitioner complains resulted in, as the Supreme Court has explained, a "substantial and injurious effect or influence in determining the jury's verdict." [10] *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710. Under this standard of review, if a court is in "grave doubt" concerning the effect of such a constitutional error, the habeas petitioner is entitled to prevail. *Barbe v. McBride,* 521 F.3d 443, 460–61 (4th Cir. 2008) (citing *Fullwood v. Lee,* 290 F.3d 663, 679 (4th Cir.2002)). Such "grave doubt" exists when, under the relevant circumstances, "the question is so evenly balanced that the reviewing court finds itself in 'virtual equipose' on the harmlessness issue." *Id.* (citing *Fullwood,* 290 F.3d at 679).

The Supreme Court's requirement in *Brecht* that habeas relief be granted only when an error has a "substantial and injurious effect" comes from the harmlesserror standard enunciated in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The Supreme Court explained this standard of review in *Kotteakos,* stating:

> If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is im-

possible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.* at 764–65, 66 S.Ct. 1239.

Petitioner contends that the Sixth Amendment error in this case had a substantial and injurious effect on the jury's verdict with respect to his conviction for second-degree murder. I agree.

Other circuit courts, as well as the Fourth Circuit, have held that a juror's use of a dictionary is not an event that is *inherently* prejudicial. *See McNeill v. Polk,* 476 F.3d 206, 226 (4th Cir.2007) (King, J., concurring) (citing *United States v. Henley,* 238 F.3d 1111, 1115–16 (9th Cir.2001)). And, I find no Supreme Court case clearly holding that prejudice is presumed when a dictionary is consulted or when the jury is otherwise exposed to external influences. Moreover, Rule 606(b) of the Federal Rules of Evidence "makes it uniquely difficult to prove that extrinsic evidence had an actual effect on jurors." *Fields,* 503 F.3d at 802 (Berzon, J., dissenting). That is, the Rule prohibits jurors from testifying about the *subjective* effect of extrinsic evidence on the particular juror.[11] *See* FED.R.EVID. 606(b). Therefore, a court will never have admissi-

---

**10.** As noted, *see supra* note 7, since the North Carolina Court of Appeals held that consultation of a dictionary does not implicate the Sixth Amendment right to confrontation, the court did not consider whether the jury's consultation of the dictionary prejudiced Petitioner.

**11.** Because of this limitation, some circuit courts of appeals have stated that it is, therefore, proper to presume prejudice when the jury has been exposed to an external influ-

ence, and to then require the State to rebut the presumption. For instance, the Eighth Circuit has stated, "Because Rule 606(b) precludes the district court from investigating the subjective effects of any extrinsic material on the jurors, whether such effects might be shown to affirm or negate the conclusion of actual prejudice, a *presumption* of prejudice is created and the burden is on the government to prove harmlessness." *United States v. Bassler,* 651 F.2d 600, 603 (8th Cir.1981).

ble evidence that directly links extrinsic materials to a juror's final vote. Nonetheless, this obviously does not mean that prejudice can *never* be found, even under the *Brecht* standard on habeas review.

There is no Supreme Court authority clearly setting forth the specific circumstances under which an external influence may prejudice the jury; therefore, each case must turn on its own special facts. *See Marshall v. United States*, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). The Fourth Circuit has looked to the following factors articulated by the Tenth Circuit in assessing prejudice when a jury consults a dictionary definition without authorization: (1) the importance of the word or phrase being defined to the resolution of the case; (2) the extent to which the dictionary definition differs from the jury instructions or from the proper legal definition; (3) the extent to which the jury discussed and emphasized the definition; (4) the strength of the evidence and whether the jury had difficulty reaching a verdict before the introduction of the dictionary definition; and (5) any other factors that relate to a determination of prejudice. *See McNeill*, 476 F.3d at 226 (King, J., concurring) (citing *Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 924 (10th Cir.1992)).

Applying the above factors leads to a finding here that the jury's consultation of a dictionary resulted in a "substantial and injurious effect or influence in determining the jury's verdict." *Penry*, 532 U.S. at 795, 121 S.Ct. 1910 (quoting *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710). First, the central issue between convicting Petitioner in this case of second-degree murder (to which he pled not guilty) or involuntary manslaughter (to which he conceded guilt) was whether he acted with "malice." The dictionary definition of "reckless" was "lack of due caution," and, if incorporated by the jury into the trial court's definition of malice, arguably lowered the degree of culpability that the State had to show in order to convict Petitioner of second-degree murder.[12] Furthermore, there is no dispute in this case that the jury struggled over whether Petitioner acted with malice and over what malice meant. Finally, although the case for a finding of malice against Petitioner was strong (given his previous DWIs, reckless driving convictions, driving without a license on the night of the crash, etc.), the jury clearly had a difficult time in reaching a verdict in this case because of its confusion over the meaning of malice as given by the trial court's instructions. All of these factors weigh in favor of a finding of prejudice in this case, even under the *Brecht* standard. Moreover, it is important to remember that the *Brecht* inquiry must focus upon the extrinsic material's impact on *any* juror, because "even a single juror's improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict." *Lawson v. Borg*, 60 F.3d 608, 613 (9th Cir.1995); *see also Fields*, 503 F.3d at 788 (Berzon, J., dissenting) ("Considering that if only one juror had declined to sentence [the habeas petitioner] to death the trial court would have been obligated to impose a life sentence, it is more probable than not that [a juror's] introduction of written researched Bible quotations into jury deliberations had a 'substantial and injurious' influence on the jury's verdict.") (quoting *Brecht*, 507 U.S. at 623, 113 S.Ct. 1710).

---

**12.** To this extent, I find no merit in the MAR court's statement that the jury's reliance on dictionary definitions would have actually *increased* the burden on the prosecution in proving that Petitioner acted with malice, and that reliance on the dictionary definitions therefore could not have prejudiced Petitioner. (*See* MAR Order, pp. 4–5, attached to Petition as Ex. 2.)

In addition, I find the fact that there was a dissenting opinion in the North Carolina Court of Appeals and that the North Carolina Supreme Court affirmed the North Carolina Court of Appeals on a split vote, specifically holding that the Court of Appeals decision was therefore not precedential, is some indication that there is "grave doubt" as to whether the consultation of a dictionary in this case prejudiced Petitioner. The dissenting opinion in the Court of Appeals decision demonstrates persuasively why "grave doubt" exists under the *Brecht* standard:

> The critical issue in this case was whether the State had proven malice. This Court set out the various methods of proving malice in *State v. Fuller,* 138 N.C.App. 481, 484, 531 S.E.2d 861, 864, *disc. review denied,* 353 N.C. 271, 546 S.E.2d 120 (2000) (internal quotation marks omitted):

> 1. The element of malice may be established by at least three different types of proof: (1) express hatred, ill-will or spite; (2) commission of inherently dangerous acts in such a reckless and wanton manner as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief; or (3) a condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification.

> The State, in this case, relied upon the second type of malice, also called "depraved-heart malice." *Id.* (internal quotation marks omitted). The trial court instructed the jury consistent with that definition.

> Following those instructions, it is undisputed that the jury foreman read to the rest of the jury a series of dictionary definitions regarding key words contained in the trial judge's definition of the word "malice," including "recklessly" and "wantonly." Using the dictionary, the jury foreman told the other jurors that "recklessly" means "lack of due caution," while "wantonly" means "arrogant recklessness of justice or the feelings of others." Because the definition of "wantonly" refers back to "recklessness," it thus incorporates the concept of a "lack of due caution." In other words, based on the dictionary, the jury could believe that both the "reckless" and "wanton" components of the trial court's definition of "malice" could be met if the jurors concluded that there had been a "lack of due caution."

> I believe that the dictionary diluted the degree of recklessness necessary for a finding of "malice." Both this Court and the [North Carolina] Supreme Court have recognized that "recklessness" encompasses a range of conduct of various degrees of severity. The Supreme Court stated in *State v. Rich,* 351 N.C. 386, 527 S.E.2d 299 (2000), that "[t]he distinction between 'recklessness' indicative of murder and 'recklessness' associated with manslaughter 'is one of degree rather than kind' " and that instructions must ensure that the jury does not confuse the "high degree of recklessness" required for second degree murder with "mere culpable negligence." *Id.* at 393–94, 527 S.E.2d at 303 (quoting *United States v. Fleming,* 739 F.2d 945, 948 (4th Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 970, 83 L.Ed.2d 973 (1985)). The [North Carolina Supreme] Court has emphasized that, standing alone, culpable negligence supports only a verdict of involuntary manslaughter. *See id.* at 395, 527 S.E.2d at 304; *State v. Wilkerson,* 295 N.C. 559, 582, 247 S.E.2d 905, 918 (1978). The Court found no error in *Rich* because the trial court "never mentioned culpable negligence" and, in light of the instructions, the Court could not "conclude that the jury could have con-

fused malice with culpable negligence." 351 N.C. at 396, 527 S.E.2d at 304.

I believe that the juror's reference to the dictionary created the potential for just such confusion. The focus on "lack of due caution" risks blurring the distinction between involuntary manslaughter and second degree murder. As this Court has explained, the recklessness referred to in second degree murder instructions "continues to require a high degree of recklessness to prove malice" and the instructions to the jury must ensure that the jurors understand "the high degree of recklessness required for murder as opposed to the lesser degree required for manslaughter." *State v. Blue,* 138 N.C.App. 404, 410, 531 S.E.2d 267, 272 (2000), *aff'd in part, rev'd in part on other grounds, per curiam,* 353 N.C. 364, 543 S.E.2d 478 (2001).

Although I recognize that the trial judge's instructions included terms and phrases that ordinarily would be sufficient to ensure that the jury found the requisite high degree of recklessness, the incorporation of the milder concept of "lack of due caution" into both recklessness and wantonness risks allowing a verdict based on the lesser standard of "culpable negligence." "Culpable negligence" is "[n]egligent conduct that, while not intentional, involves a disregard of the consequences likely to result from one's actions." *Black's Law Dictionary* 1062 (8th ed. 2004).

Because I do not believe that the State can demonstrate that the jury's reference to the dictionary definitions of "recklessly" and "wantonly" was harmless beyond a reasonable doubt, I would remand for a new trial. Based on the record in this case, I simply cannot conclude that the jury would have convicted defendant of second degree murder no matter what.

I know of no words that would sufficiently condemn defendant's conduct, and he should be severely punished. He is, however, entitled to be convicted of second degree murder based on a trial judge's instructions rather than on a dictionary definition.

*Bauberger,* 176 N.C.App. at 480–82, 626 S.E.2d at 710–11 (Geer, J., dissenting).

I agree with the dissenting opinion by Judge Geer that Petitioner's conduct in this case warrants severe punishment. Indeed, if a jury decides that Petitioner acted with malice in accordance with how that term is defined by a trial judge's instructions, then without doubt he will be convicted and punished for second-degree murder. The point here, as Judge Geer observed in her dissent in the state court, is that Petitioner has the right to be convicted of second-degree murder according to the trial judge's instructions, rather than based on a dictionary definition that arguably lowered the standard of culpability for finding malice in this case.

Finally, Respondent argues that, considering the circumstances in this case—for instance, that Petitioner had previously been convicted of drunk driving, that on the night in question he was driving without a license, etc.—it would be difficult for the jury to have determined that Petitioner did *not* act with malice, even under the court-supplied instruction regarding malice. Respondent completely misses the point, as it is undisputed that the jury was *in fact* struggling with whether to find that Petitioner acted with malice under the court's instructions. This is precisely why the jury foreman went to the library to check out the dictionary in the first place. Moreover, under the *Brecht* standard of review, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the

conviction cannot stand." *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239. Because there is "grave doubt" here, it will be recommended that the habeas petition be granted.

## V. Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that Respondent's motion for summary judgment (docket no. 6) be **DENIED** and that the petition be **GRANTED.** The State of North Carolina should be given a limited time period to retry Petitioner or he should be exonerated on the second-degree murder charge.